Wilfred KEYES et al., Plaintiffs,

v.

SCHOOL DISTRICT NO. 1, DENVER, COLORADO, et al., Defendants,

Congress of Hispanic Educators, Intervenors,

Kenneth W. Harris, Deborah J. Harris, Daniel J. Patch, Marilyn Y. Patch, Chriss Andres, Ronald Greigo, Dora Greigo, and Randy French, Additional Intervenors.

Civ. A. No. C–1499.

United States District Court, D. Colorado.

July 30, 1979.

Gordon G. Greiner, Holland & Hart, Denver, Colo., James Nabrit, III, NAACP Legal Defense Fund, New York City, for plaintiffs.

Remigio Pete Reyes, Attorney Mexican American Legal Defense and Education Fund, Inc., Denver, Colo., Peter D. Roos, Mexican American Legal Defense and Educational Fund, San Francisco, Cal., for intervenors.

Richard H. Right, Timothy B. Walker, Denver, Colo., for additional intervenors.

Deborah J. Harris, Marilyn Y. Patch, pro-se intervenors.

Michael H. Jackson, School District No. 1, Denver, Colo., for defendants.

## MEMORANDUM OPINION AND ORDER

MATSCH, District Judge.

In April 1974, this court was compelled to implement the mandate of the Supreme Court of the United States to disestablish a dual school system in Denver, Colorado. The initial phase of the remedy ordered by the court was a desegregation plan authored by Dr. John Finger, with modifications, providing for the desegregation of elementary schools by rezoning, busing, using satellite areas and classroom pairing on a part-time basis. The junior high schools were to be desegregated by new attendance zones and satellites and the senior high schools were to undergo the same process of desegregation. Programs of compensatory education were ordered for five predominately Hispanic elementary schools which were not included in pupil reassignment plans. The court established an Anglo percentage ratio to minority students as a guideline for measuring the segregation of particular schools. For elementary schools the established range was a minimum of 40% Anglo students and a maximum of 70% Anglo population. In secondary schools, the range was 50%–60% Anglos and it was recognized that there could and would be deviations from these ranges for particular circumstances and compelling necessity.

An appeal to the United States Court of Appeals, Tenth Circuit, resulted in a partial reversal of that original desegregation plan. The part-time classroom pairing was ordered abolished and the Hispanic schools were required to be included. Acting under that mandate from the Court of Appeals, this court approved a plan which was submitted by the School District and accepted by the plaintiffs and intervenors in this action in 1976. That plan provided for the pairing of many elementary schools by establishing primary schools for grades K,

1–3, and intermediate schools covering K, 4–6. The number of students bused in the elementary grades was increased as a result of the appellate court's decision. The Anglo percentages were reduced to a range of 34%–64% in the 1976 plan because the number of Anglo students in the District had declined. Thus, in September 1973, there were 38,463 students in the elementary grades and the Anglo percentage was 54.1%. When the schools opened under the Finger Plan in September 1974, there were 35,307 students in the elementary grades and the Anglo percentage was 51.7%.

This case was assigned to me after the entry of the 1976 Order and jurisdiction has been retained to insure performance of the duty to desegregate the schools. Monitoring of the operations of the Denver School system has been accomplished through the periodic filing of reports by the District as required by the court orders and through the activities of the Community Education Council (CEC) which was reorganized and vitalized by an order entered on October 14, 1977. In that order, I said, *inter alia* :

> As a part of a movement toward the objective of local control, the CEC should be changed to a smaller size with a more specific function. It will be the Court's primary agent in observing and enhancing compliance with the desegregation orders. While it will not be given the standing of a party, the CEC will be authorized to evaluate the information which it gathers and to recommend such action by the defendants as may be indicated to achieve the required results. Upon a failure of defendants to respond adequately to such recommendations, the dispute resolution procedures established in Paragraph 4 of these Orders may be invoked.

Those dispute resolution procedures involved an opportunity for mediation and conciliation through the United States Magistrate. The CEC was also directed to appoint persons to advisory groups and to prepare and file reports concerning the implementation of the desegregation plans for all of the Denver Schools.

Because of apprehension about the declining population and particularly the loss of Anglo students, the School Board's 1976 plan requested that no additional changes be made in student assignments for a period of three years. That request has been honored by this court during that time in that the only changes ordered were those requested by the School District for the limited circumstances of particular situations. Nonetheless, the decline of student population and Anglo percentage has continued. The problem of declining pupil enrollment and consequent excess plant capacity was recognized by the Board of Education in 1977 and in May of that year, the Board adopted a resolution establishing an advisory committee of citizens to make recommendations on criteria for the closing of schools in what came to be called the School Closing, Consolidation and Utilization Project. That Committee presented its report and recommendations to the Board of Education in March 1978 and the report was accepted by the Board in April 1978.

As originally designed and recommended, the process called for a three year program from inception to implementation. Accordingly, no action was contemplated before September 1981. The Board of Education reduced the time frame to September 1980.

On June 21, 1978, the CEC filed a Report with this court and informed it that the Board of Education had appointed an advisory committee to study various aspects of school closures, consolidations and utilization in the Spring of 1977. The CEC expressed some concerns about the preliminary stages of that study and particularly the projected time of 1980 for court review and 1981 for plan implementation. The council questioned whether solutions could be deferred until 1981 because of perceived imbalances in ethnic and racial compositions and crowded conditions existing in a number of schools.

On July 19, 1978, the CEC submitted a list of written questions to the Superintendent of the Denver Public Schools, following up on the contents of the June 21, 1978 Report. The Superintendent on August 1,

1978, filed a Staff Response to the CEC Report and in responding to a question concerning the time for review of the Denver Public School's Staff Report on School Closing, Consolidation And Utilization, May 11, 1978, the staff said:

The hypothetical time line included in the May 11, 1978 Staff Report (attached) reflected consideration for timely and expeditious treatment of each component in the total process. The original report submitted by the Advisory Committee on school closure, consolidation and utilization included no formal time line. There were, however, several references to timing on Pages 15 and 24 (attached). Although not stated in calendar form, it is clear from these comments that a liberal time line is better than a conservative one. The hypothetical time line also indicates that Phase IV Decision-Implementation is to begin in February, 1980. This component would involve final Board decision and then immediate presentation to the Court for review. It is anticipated that this review would begin during April, 1980 which is far in advance of the June, 1981 completion target. [Staff Response to Community Education Council Report, August 1978, Page 50]

By a letter dated October 2, 1978, the CEC requested that this court convene a hearing to obtain a status report from the School Board and administration on comprehensive, city-wide planning for the schools to take effect at the end of the three year moratorium, the status of the in-service program and the status of the affirmative action program. On November 29, 1978, this court, *sua sponte*, entered an Order for a hearing to be convened on January 13, 1979 to consider when the Board of Education should be required to submit a detailed comprehensive plan for the assignment of students to schools for the year 1979–80, when a comprehensive report of compliance with the affirmative action and in-service requirements of the court orders should be filed and whether the District should be required to study and report on practices and programs in the assignment to classes and curricula within

schools. That hearing was held and at its conclusion on January 13, 1979, this court was informed that the Board of Education had directed the filing of a report by an Administration Task Force in March 1979 on school closings and school assignments. The court set May 1, 1979 as the date for the Board to file a comprehensive student assignment plan and June 1, 1979 was set as the reporting date with respect to the status of compliance with orders requiring affirmative action in the hiring, assignment and in-service training of teachers, administrators and staff and for a proposal to study whether there was evidence of purposeful racial discrimination by faculty within the schools.

On March 19, 1979, the School District moved for an enlargement of time to and including June 1, 1979 to submit the comprehensive plan for the assignment of students for the 1979–1980 school year to give more time for public comment and reaction to the plan. That motion was denied by an order on March 19, 1979, because the extension would limit the time within which hearings could be held to consider the issues arising in this court.

The plan was timely filed on May 1, 1979 in the form of Resolution No. 2060 passed by the Board of Education on April 17, 1979. This court then convened a hearing on May 22, 1979 to consider what procedures would be followed for the purpose of considering any objections to the implementation of Resolution No. 2060 for the school year 1979–1980 and such a procedure was established at that hearing.

Objections were filed by the plaintiffs and intervenors and evaluations were submitted by the CEC. Additionally, two new sets of intervenors were permitted to file pleadings with respect to the special concerns of Satellites Nos. 24 and 25.

An evidentiary hearing was held on July 20, 1979 with participation by all parties, exclusive of the CEC. That hearing was structured as a hearing on the motion of the defendant School District No. 1 to implement those portions of Resolution No.

2060 dealing with school closings and pupil assignment for the school year 1979–1980.

No objection was made to the closings of four elementary schools, Elyria, Emerson, Ellsworth and Belmont and, accordingly, the District has been authorized to proceed with such action as may be necessary to effect such closings. Likewise, there has been no dispute arising concerning the reassignments made necessary by the closings of Elyria and Belmont. Elyria was used only for kindergarten and early childhood pupils who will be reassigned to nearby Swansea School. Belmont School in the southwest area of town has had an attendance zone that is divided by Morrison Road, a heavy traffic thoroughfare. The Board proposes to use that street as a dividing line and assign the displaced students to Knapp to the north and Westwood to the south and there is no objection to this proposal by anyone.

■ The issues raised by the objections made to the other pupil reassignment proposals and the alternative proposals made by the parties and the CEC illustrate the interrelationship of the schools within the system and the far reaching effects of any changes made in any schools. The assignment of pupils to schools as a matter of educational philosophy or social policy is not a subject which is normally within the jurisdiction of this court.

However, involvement in these issues is necessary because of the obligation to compel compliance with the District's affirmative duty to eradicate the effects of a segregated system and to establish a unitary, non-racial program of public education which will provide equality of opportunity. "Each instance of a failure or refusal to fulfill this affirmative duty constitutes a violation of the Fourteenth Amendment." Columbus Bd. of Ed. v. Penick, —— U.S. ——, 99 S.Ct. 2941, 2946, 61 L.Ed.2d 666 (1979). Accordingly, the focus of our attention must be on whether the proposed changes are progressive or regressive in that required direction. That standard is easier to articulate than to apply.

■ It is not possible to define desegregation or to list all of the constituent elements of a unitary, non-racial system of education. Certainly, these concepts entail more than mere ethnic and racial ratios of pupils attending a given school. Green v. County School Board, 391 U.S. 430, 435, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968). There are 123 schools in School District No. 1 and 93 of them are concerned with grades K, 1–6. While this court has used $\pm$ 15% of the Anglo population as a guideline for considering whether a particular school building is racially identifiable, such guidelines are not themselves the measure of constitutional concepts. "The constitutional command to desegregate schools does not mean that every school in every community must reflect the racial composition of the school system as a whole." Swann v. Charlotte-Mecklenberg Bd. of Ed., 402 U.S. 1, 24, 91 S.Ct. 1267, 1280, 28 L.Ed.2d 554 (1971). The mere existence of such racially identifiable schools within a system does not in itself violate the Constitution. It is, however, an indicator requiring further inquiry into the possibility of such a violation. In addition to ethnic ratios resulting from ascribed attendance zones, other elements of the educational process must also be considered. They include the hiring, training and assignment of faculty, administrative and staff support, curricula, athletic and activities programs, physical plant and facilities and cultural orientation. See, Green v. County School Board, 391 U.S. 430, 435, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968).

■ When a school district is in transition from a segregated system to a unitary one, there are additional concerns. It cannot be questioned but that the 1974 and 1976 court Orders were very disruptive of the customary uses and practices in the Denver Schools, and that there have been reactive forces which have had a negative impact. The material which has been submitted to this court by the Task Force, administration and School Board appear to reflect an opinion that the substantial decline in enrollment which has taken place within the past ten years is at least partially attributable to this litigation and it has

been noted that the sharpest declines occurred when court Orders were entered in 1974 and 1976. It may be that the inference that these judicial intrusions have caused withdrawals from the public schools is a valid one, but that in itself is irrelevant to the duty which the law has imposed upon the District. The avoidance of "white flight" is not the criterion by which we measure progress in this case.

> The remedy for such segregation may be administratively awkward, inconvenient, and even bizarre in some situations and may impose burdens on some; but all awkwardness and inconvenience cannot be avoided in the interim period when remedial adjustments are being made to eliminate the dual school systems.

*Swann v. Charlotte-Mecklenburg Bd. of Ed.*, 402 U.S. 1, 28, 91 S.Ct. 1267, 1282, 28 L.Ed.2d 554 (1971).

The Finger Plan, as modified by the 1976 Order accepting Resolution No. 1897, has required the transportation of many students and many of them have had to ride the bus for long distances. Segments of the city were designated as Satellite areas to fill ratios at schools far removed from the Satellites' residential neighborhoods. There can be no question but that these requirements have been burdensome and that the busing of students has been the core of controversy in Denver as in many other cities. It is important that such a burden be shared and that there be no disproportionate impact on a racial or ethnic basis. One of the purposes of the pairing approach was to provide an opportunity for each elementary school student to have four years of the K through 6 periods spent in a school reasonably near his home.

It is apparent that Denver continues to be committed to the neighborhood school concept for elementary education and the District's proposals in Resolution No. 2060 are constructed with a design to increase the number of walk-in students and to decrease transportation and cost requirements. The primary difficulty with the proposal is that such an objective is pursued without adequate regard for the particular

persons most directly affected. That is best illustrated by considering that the proposed assignment of students from Satellite 24 (Lowry Air Force Base) is to use them as fillers for adding Anglo ethnicity to other schools and that they continue to ride the buses without any apparent hope for the establishment of any neighborhood school for them.

The Board and the administration recognize that there are schools which have never met the guidelines and they do now seek to address that problem in the proposals concerning Gilpin, Fairview and Greenlee. The several suggestions made by the plaintiffs, intervenors and CEC, centering about these schools, present the focal points of the greatest dispute and disagreement on the pending motion. It is just such a disagreement and the selection among many options that the dispute resolution process established by the Order of October 14, 1977 was designed to accommodate. Regrettably, the need for immediate action to enable the implementation of any ordered changes by September 1979 precludes the use of that approach. Indeed, the School Board itself has not met in a legislative session since the objections and alternative proposals have been submitted and, accordingly, there has been no compromise considered and there can be no waiting for an accommodation. The need is for decision and action and there is no alternative to the exercise of this court's jurisdiction to compel that action. "If school authorities fail in their affirmative obligations . . . judicial authority may be invoked." *Swann v. Charlotte-Mecklenburg Bd. of Ed.*, 402 U.S. 1, 15, 91 S.Ct. 1267, 1276, 28 L.Ed.2d 554 (1971).

Having arrived at that conclusion, it is incumbent on me to indicate a rationale in approaching a court ordered pupil assignment plan at this point in this proceeding. Of first importance, is the acknowledgment that this court has no expertise in educational matters and that principles of federalism and of separation of powers require deference to the duly elected public authority of the School Board. "School authorities

have the primary responsibility for elucidating, assessing, and solving these problems." *Brown v. Bd. of Ed. (II)*, 349 U.S. 294, 299, 75 S.Ct. 753, 755, 99 L.Ed. 1083 (1955). Of equal importance, is the recognition that what is now to be ordered must be considered to be interim action required to meet an existent emergency.

It should be noted that, in its present posture, this case is much different from that treated by the Supreme Court in *Pasadena v. Spangler*, 427 U.S. 424, 96 S.Ct. 2697, 49 L.Ed.2d 599 (1976), where the court expressly distinguished "step at a time" desegregation plans from the inflexible "lifetime" scrutiny adopted by the trial court in that case. *Id.* at 435, 96 S.Ct. 2697. While it has been necessary for the entry of interim orders in this case, the ultimate objective is to define and determine the existence of a unitary system so that jurisdiction over the Denver schools may finally be relinquished.

■ In reviewing and considering the proposals for pupil reassignment in Resolution No. 2060 and, particularly the Task Force Report supporting those proposals together with the Task Force responses to the suggestions of the plaintiffs and CEC, I have become disturbed that there may be some misunderstanding or failure of perception concerning the scope of the affirmative duty which the constitutional requirement of equal educational opportunity has imposed upon the defendant School District. There is such a consistency of reference to the ± 15% Anglo ethnicity guidelines as to suggest that an adherence to that ratio in each school building is an adequate compliance with this court's mandate. That clearly is not the case. It is not sufficient simply to count the bodies in each school at any one time and separate them out in racial or ethnic groups. Rather, use of mathematical ratios should be "no more than a starting point in the process of shaping a remedy, rather than an inflexible requirement." *Swann v. Charlotte-Mecklenberg Bd. of Ed.*, 402 U.S. 1, 25, 91 S.Ct. 1267, 1280, 28 L.Ed.2d 554 (1971). Similarly, in considering the consequences of school closings or new construction, there must be more than a mechanistic manipulation of such body counts.

■ What is important is the educational experience provided for each student in the school system during the time of the thirteen years of exposure to it. The objective of public education is to enable persons to achieve the ability to function as contributing citizens in a pluralistic society of ordered liberty. In all of the years of litigation since *Brown v. Bd. of Ed.*, the courts have done nothing more than seek ways to insure that race will not be a disadvantage in education—"the very foundation of citizenship." *Brown v. Bd. of Ed. (I)*, 347 U.S. 483, 493, 75 S.Ct. 753, 99 L.Ed. 1083 (1954).

In Resolution No. 2060, the Board of Education has directed additional study before undertaking any more changes in school closings, consolidation or new construction or any other changes in pupil assignments. The difficulties which have been encountered here demonstrate the wisdom of that approach. Nonetheless, it must be remembered that to the extent there are any who are now being disadvantaged, every delay in achieving the final objective is an irrevocable loss to those persons who are now involved in the only educational opportunity they will have in their lifetimes.

Significantly, the Board failed to establish any time for the "in-depth study of city-wide demographic trends and vital statistics" to be completed. The Board did specifically direct that the study should include data available from the 1980 Census. That direction would delay the report until at least some time in 1981 which would be the earliest time that such data could become available. There is nothing before me to indicate that the 1980 Census data would be necessary or that the staff would be unable to develop adequate information through its own resources.

■ Resolution No. 2060 also specifies a staff evaluation of current and potential school populations in the Montclair-Park Hill area for possible boundary changes and there is a direction for the staff to study

present enrollment and population projections at both elementary and secondary levels to assess and anticipate facility requirements in the Montbello area. The court has not been given any explanation of the need for the separate studies if a city-wide evaluation and projection are to be made. Perhaps it is necessary once again to emphasize the duty to create a unitary, system-wide educational plan and to act as expeditiously as possible under the circumstances. The arbitrary provision of Resolution No. 2060 that no additional schools will be considered for closing before September 1982 is inconsistent with the affirmative obligations of the Board and that portion of the Resolution is specifically rejected by this court.

What is now needed is recognition by the Board of Education, school administration, and staff that they have not yet established a unitary, non-racial school system in Denver, Colorado and that they have a legal obligation to demonstrate to this court that they are taking appropriate action to reach that result. Such action must include the affirmative action plans which are now in the dispute resolution procedure with the Magistrate.

The appendices to the May 1, 1979 Report to this court include minutes of the public hearings held by the School Board before adoption of Resolution No. 2060. The citizens who spoke at those hearings repeatedly emphasized their perception that their neighborhoods were becoming naturally integrated and that many young families were moving into the areas which could be served by the schools which were then under consideration for closing. Plaintiffs and the intervenors share that perception and it has been suggested that the Board consider constructing new school buildings in the central area of Denver.

If these perceptions are accurate and if such trends do develop, the future of the Denver School system will be serene and secure. Residential growth with natural integration will contribute much to the achievement of a unitary system with racial neutrality. The process may be materially assisted and advanced by creative new proposals for educational enhancement during the time of transition. This court stands ready to receive and consider such proposals.

I have been acutely disappointed with the apparent resistance of the administration and staff of School District No. 1 to the evaluations and suggestions made by the CEC. The staff analysis of the Community Education Council proposals of June 26, 1979 is petulant and derisive in tone. It should be recalled that these persons have been selected personally by me to advise and inform in carrying out my constitutional responsibility in this case and that they are also a vital connecting link with the community served by the School District. I expect nothing less than full cooperation with the CEC and compliance with the October 14, 1977 Order in all future developments in this proceeding.

In making the decisions for the orders now to be entered, I have endeavored to follow the Board's approach of attempting to resolve the immediate problems with a minimum disruption of community stability. Where I have disagreed with the Board's proposals, that disagreement results from the belief that the choices which I have made are more consistent with movement in the direction of a unitary system.

In analyzing the proposals, it should first be observed that in September 1978, the School District had a 43.3% Anglo enrollment in the elementary schools, exclusive of special education and kindergarten classes. Application of the ± 15% guideline, permits as few as 28% Anglo and as many as 58% Anglo enrollments in any given school to avoid racial identification of that school.

## ELLSWORTH

Ellsworth Elementary School is located at Ellsworth Avenue approximately two blocks west of Colorado Boulevard in southeast Denver. Steck, Bromwell and Knight are three other elementary schools within a one mile radius of Ellsworth. The closing of Ellsworth School requires the reassignment of 101 pupils of whom 24 are within the Ellsworth home area, 23 are

from Satellite 26 (located near Bradley School in southeast Denver) and 54 are from Satellite 15 (located near Barrett School in an area near City Park).

The proposal in Resolution No. 2060, adopting the Task Force recommendation, is to assign the 24 Ellsworth home area pupils to Bromwell which can also be considered a home area school for those pupils. The Satellite 26 area pupils would be assigned to Bradley, a school not far distant and the Satellite 15 children would go to Carson, located to the southeast of Ellsworth.

The plaintiffs have objected to this proposal because the pupils to be transferred are predominately Anglo and they would be moving to schools which are already at or above 50% Anglo. The plaintiffs suggest the assignment of the Ellsworth home area and Satellite 26 children to Steck School (near Ellsworth) and the return of Satellite 15 children to schools in their neighborhood area with those living east of Colorado Boulevard attending Park Hill (1–6) and those west of Colorado Boulevard entering the Barrett-Knight pair, attending Barrett for grades 1–3 and Knight for grades 4–6. That would increase the Anglo enrollment at Steck from 37% to 43% and provide continuity by keeping most of the Ellsworth children together at Steck. It would also eliminate the transportation of all Satellite 15 children excepting those in grades 4–6 living west of Colorado Boulevard who must be transported to Knight.

The Community Education Council made an advisory proposal to place the Satellite 26 children in the Ash Grove/Hallett pair, increasing the Anglo percentage at Ash Grove from 38.8% to 41.4% and at Hallett from 35.7% to 36.9%. It would also give the Satellite 26 children an opportunity to attend nearby Ash Grove for grades 4–6, but the distance from the Satellite 26 residential area to Hallett for grades 1–3 is far greater than the distance from Satellite 26 to Steck.

While each of the proposals has advantages and disadvantages, my finding and conclusion is that the plaintiffs' proposal is more consistent with progress toward achieving stability in a unified, non-racial school system. It is a minimal disruption for the Ellsworth and Satellite 26 children and it removes most of the transportation burden which has been borne by the children in Satellite 15. While it may result in some increase in the class size at Park Hill, that effect is not significant. Accordingly, the reassignment of the Ellsworth students will be in accordance with the plaintiffs' alternative proposal set forth in the Plaintiffs' Supplemental Statement of July 19, 1979.

## EMERSON

Emerson School is on East 14th Avenue, one block south of Colfax Avenue. Its closing will require the reassignment of 332 pupils. Resolution No. 2060 uses Colfax Avenue as a dividing line and assigns the pupils north of Colfax to Ebert and Wyman Schools. Those living south of Colfax would be assigned to Moore and Stevens Schools. All four of these schools are within a one mile radius of Emerson. Additionally, Satellite 3 children (Satellite 3 is in an industrial area of downtown Denver whose residents have been attending Emerson) would be moved to Stevens. To accommodate the added students at Wyman, it is proposed that 126 students from Satellite 25 (an area on the eastern boundary of Denver) be transported to Fairview on the far west side of town.

There are 109 pupils from Satellite 24 who have been attending Emerson School and 82 of them are Anglos. Satellite 24 is composed of 7 areas within Lowry Air Force Base and all of the children in that Satellite are the children of military personnel assigned at Lowry. Those children have been assigned to five different elementary schools and they have been enduring long distance bus rides to attend four of those schools. The proposal in Resolution No. 2060 would assign some of those children to Carson School which is not far distant from Lowry. That would still be another school for the Lowry children because none of them now attend Carson.

In summary, the Board Proposal would result in seven changes sending the children now at Emerson to four different schools and diverting Satellite 25 children from Wyman to Fairview. That would lower Anglo percentages at Wyman from 36% to 29% and Moore, Stevens and Carson would remain predominately Anglo schools. Those are the reasons for the plaintiffs' objections to the Emerson reassignment and for the alternative proposal of retaining Satellite 25 at Wyman, assigning children from north of Colfax Avenue to Bromwell, assigning the other Emerson area students to Stevens and assigning the Satellite 24 children to Fairview. Wyman would remain 36.0% Anglo and there would be no disruption of the Satellite 25 children. Stevens would be reduced to 48.7% Anglo with the Satellite 3 children.

The CEC recommended against assigning either Satellite 24 or Satellite 25 to Fairview, suggested the retention of Satellite 25 at Wyman and placed the Satellite 24 children into the paired school situation involving Gilpin (1–3) and Whiteman (1–6). That proposal ties directly in with the Gilpin School and the Fairview-Greenlee-Traylor situation.

FAIRVIEW–GREENLEE–TRAYLOR

Fairview (1–3), Greenlee (1–3) and Traylor (4–6) are now in a three-school grouping. Fairview has an Anglo percentage of 17.0%, Greenlee has an Anglo percentage of 22.5% and Traylor has an Anglo percentage of 41.3%. Fairview has never been within the guidelines. The School Board proposes to withdraw Fairview from the triad and make it a K, 1–6 school by reassigning 36 pupils in grades 1–3 from the Traylor area to Greenlee, reassigning 122 pupils in grades 4–6 from Traylor back to Fairview, and reassigning 126 pupils in grades 1–6 from the Satellite 25 area from Wyman to Fairview. Fairview would then have only an Anglo percentage of 22.1%. Traylor would have an Anglo percentage of 53.1% and it would continue to be paired with Greenlee as the primary school with the result that Greenlee would have 30.1% Anglo.

Gilpin is now a K, 1–3 school paired with Doull (4–6). The Anglo percentage at Gilpin is 18.1% and it has never been within the guidelines since the order of 1974. The Board proposes to correct that imbalance by bringing in 53 students from Satellite 24 who are currently assigned to Whiteman, making Gilpin 31.3% Anglo and by assigning 30 grades 4–6 pupils from Satellite 24, currently assigned to Whiteman, to Doull resulting in bringing that school from 38.5% to 44.1% Anglo. The removal of these 83 students from Whiteman would reduce its Anglo percentage from 64.3% to 61.6%. These proposed transfers of Satellite 24 children from Whiteman to Gilpin and Doull and from Emerson to Carson have resulted in a new intervention on behalf of the parents and students of Satellite 24 who strongly object to being used as a filler all over the Denver system.

The CEC has made a very elaborate proposal to remove Fairview from the triad, transfer Satellite 1F to Bradley, pair Fairview with both Doull and Rosedale, put the Satellite 24 pupils from Emerson in Whiteman, pair Whiteman with Gilpin, return Satellites 19 and 35 from Whiteman to the Hallett/Ash Grove pair, and remove Satellite 29 from Whiteman to go to Hallett/Ash Grove, Holm or Bradley. There is an obvious equity in trying to establish a home school for Satellite 24 children and these moves would improve Anglo percentages as well as remedy some of the existing imbalance of the busing burden. They would, however, require a very considerable disruption of many students and require many adjustments in operations. Additionally, I do not feel sufficiently informed of all of the consequences of these changes and there isn't enough time to provide for the submission of additional information before the start of the new school year. For these reasons, I reject this CEC proposal.

The Fairview-Greenlee-Traylor problem is best solved by accepting the plaintiffs' suggestions pairing Fairview and Rosedale with Satellites 1T and 1R included. Fairview would remain a primary (1–3) school

and Rosedale would change from 1–6 to an intermediate (4–6) school. The Satellite 24 children from Emerson will be assigned to the new Fairview-Rosedale pairing to increase the Anglo attendance. Satellite 1F children will be reassigned to Bradley to reduce the Anglo percentage there.

The Emerson reassignments which are most acceptable are to adopt Colfax Avenue as the dividing line with the pupils north of Colfax transferring to Ebert, Whittier and Wyman schools and the pupils living south of Colfax going to Moore and Stevens schools. The use of Whittier should avoid overcrowding at either Wyman or Ebert Schools. Satellite 3 children will also attend Stevens school. Satellite 25 pupils will remain at Wyman. The Satellite 24 children from Emerson will go to the Fairview/Rosedale pair.

## GILPIN

Gilpin (1–3) is now paired with Doull (4–6). Gilpin has an Anglo percentage of 18% and has never been within the court guidelines. Doull's Anglo percentage is 38.5%. The Board proposal to bring Gilpin within the guidelines is to transfer 83 children from Satellite 24 now at Whiteman to the Gilpin/Doull pair. I am rejecting that proposal because the burden on the Satellite 24 people of this move from a nearby school is greater than the benefit obtained in removing the racial identify of this one primary school. Accordingly, no change will be made in the Gilpin/Doull pair assignments.

## McKINLEY–THATCHER

McKinley-Thatcher is a new school to be opened at the location of Louisiana Avenue and Grant Street. Thatcher is a K, 1–6 school with pupils assigned from Satellite 1T (Fairview area) and Satellite 4 (Ebert area) transported to it. McKinley has been an intermediate school (K, 4–6) paired with Boulevard, a K, 1–3 school. The Board proposed combining the attendance areas for McKinley and Thatcher Schools with the new McKinley-Thatcher School as an intermediate K, 4–6 school paired with Bou-

levard which would continue as the primary school. Satellite 1T and Satellite 4 students would be involved in this pairing.

The plaintiffs suggested assignment of the pupils in Satellite 1R and 1T to Rosedale in the new Rosedale-Fairview pairing and returning Satellite 4 to Ebert. That would interfere with the Board's commitment to placing a kindergarten program at Ebert (which does not now have one) but the offset in stabilizing the Fairview area as reflected in the concerns expressed by the CEC certainly outweighs considerations of the kindergarten. Accordingly, I accept the plaintiffs' suggestion on these satellites together with the McKinley-Thatcher/Boulevard pairing and the Rosedale-Fairview pairing.

## REMOVAL OF ASHLEY MOBILE UNITS

The Task Force and the Board have simply not provided adequate support for the proposal to remove the mobile units at Ashley in view of the projections which have been made to the damaging effect on special programs which are particularly important to minorities at that school. Accordingly, that proposal is denied.

## ELYRIA

The closing of Elyria School simply removes that capacity for kindergarten and early childhood education pupils who will be reassigned to nearby Swansea School and no one has made any objection to that reassignment. This proposal is approved.

## BELMONT

Belmont School is in the southwest area of Denver, with an attendance zone that is divided by Morrison Road, a heavy traffic thoroughfare. The Board proposes to use that dividing line and assign the displaced students to Knapp on the north side and Westwood on the south side and no objection to that proposal has been made. Accordingly, this proposal is affirmed.

### OAKLAND–McGLONE

On July 23, 1979, the School District filed a motion to authorize the establishment of Oakland as a K, 1–2 school and McGlone as a 3–6 school. That matter was also raised orally at the July 20, 1979 hearing and no objection was made. Accordingly, the motion for that authority is granted.

Upon the foregoing as the findings of fact and conclusions of law herein, it is now

ORDERED, that School District No. 1 shall proceed to take all necessary action for the implementation of the school closings and pupil assignments for the school year 1979–1980 as follows:

Elyria, Belmont, Ellsworth, and Emerson Schools will be closed.

The Elyria kindergarten and early childhood education students will be reassigned to Swansea.

The Belmont students living north of Morrison Road will be reassigned to Knapp and those living south of Morrison Road to Westwood.

The students who have been attending Ellsworth will be reassigned as follows: The children from the Ellsworth home area and the children from Satellite 26 will be assigned to Steck. The Satellite 15 children will be returned to their neighborhood schools with the children living east of Colorado Boulevard to Park Hill and the children living west of Colorado Boulevard to the Barrett-Knight pair.

The students who were accommodated at Emerson will be reassigned as follows: The Emerson home students, living north of Colfax, will be assigned to Ebert, Whittier, and Wyman. The Emerson home students, living south of Colfax, will be assigned to Moore and Stevens Schools. Satellite 3 children will also attend Stevens. Satellite 25 children will remain at Wyman. Satellite 24 children from Emerson will be reassigned to the Fairview/Rosedale pair established in these orders.

The children affected by the Fairview-Greenlee-Traylor reorganization will be assigned as follows: Fairview will be removed from the triad with Traylor and Greenlee. Traylor and Greenlee will be paired schools. Fairview, remaining a primary school (1–3), will be paired with Rosedale, which will be changed from a 1–6 school to an intermediate school (4–6). The children in Satellite 1R, Satellite 1T, and Satellite 24 (who previously attended Emerson) will be assigned to the Fairview-Rosedale pair. The children in Satellite 1F will be assigned to Bradley.

The new McKinley-Thatcher school will be opened.

The opening of the new McKinley-Thatcher school will involve the following assignments: The Satellite 4 students will be assigned to Ebert. The attendance areas for McKinley and Thatcher are combined and the new school, McKinley-Thatcher as an intermediate school (4–6) is paired with Boulevard (1–3).

The Gilpin-Doull pair assignments will continue without change.

The Ashley Mobile units will not be removed.

Oakland is established as a K, 1–2 school.

McGlone is established as a 3–6 school.