Wilfred KEYES, et al., Plaintiffs,

v.

SCHOOL DISTRICT NO. 1, DENVER, COLORADO, et al., Defendants,

Congress of Hispanic Educators, Intervenors.

Civ. A. No. C-1499.

United States District Court, D. Colorado.

May 12, 1982.

Gordon G. Greiner, Holland & Hart, Denver, Colo., James Nabritt, III, NAACP Nat. Legal Defense Fund, New York City, for plaintiffs.

John S. Pfeiffer, Gorsuch, Kirgis, Campbell, Walker & Grover, Michael H. Jackson, School District No. 1, Denver, Colo., for defendants.

## MEMORANDUM OPINION AND ORDER

MATSCH, District Judge.

The immediate issue to be decided is whether the defendant School District No. 1 should be authorized to implement the pupil assignment plan of March 30, 1982, admitted into evidence as defendant's Exhibit F–1. My answer is yes, with qualifications and reservations. An understanding of the future requirements attendant upon this qualified approval may be assisted by a review of the remedial phase of this lawsuit.

It must be remembered that in *Brown v. Board of Education*, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), the United States Supreme Court established the constitutional principle that racially segregated public school facilities are inherently unequal, resulting in a deprivation of the equal protection of the law guaranteed by the Fourteenth Amendment to the United States Constitution. That reversal of the "separate but equal" doctrine removed the legal foundation for the dual school systems which had existed in many states.

While Denver did not have a formal policy of separating students by race, the Supreme Court concluded that the manipulation of a neighborhood school concept constituted a policy of deliberate racial segregation and instructed that upon the failure of the school board to show that the Park Hill area was isolated from the rest of the district, the system must be declared a dual system and the Denver Board of Education must be directed to desegregate the entire system "root and branch." *Keyes v. School District No. 1, Denver, Colorado*, 413 U.S. 189, 213, 93 S.Ct. 2686, 2699, 37 L.Ed.2d 548 (1973).

After extensive hearings during which Denver rigidly resisted proposed remedial measures, this court compelled compliance with a desegregation plan which was based upon the recommendations of Dr. John Finger. *Keyes v. School District No. 1, Denver, Colorado*, 380 F.Supp. 673 (D.Colo. 1974). After the part-time classroom pairing and compensatory education provisions of that plan were disapproved by the Tenth Circuit Court of Appeals, *Keyes v. School District No. 1, Denver, Colorado*, 521 F.2d 465 (10th Cir. 1975), the parties in this case came together and agreed upon a modified plan which was approved by a court order entered in 1976. Because a sense of stability was a factor in that stipulation, it was agreed that no changes would be made for three years.

A central consideration in those plans was the avoidance of racially identifiable schools by adhering to a guideline that all schools have pupil populations within ± 15% of the anglo student enrollments in the district. A declining population and a decreased anglo enrollment made changes necessary in 1979. The Board of Education responded to that need with Resolution No. 2060, providing for the closing of four elementary schools and changes in pupil assignments for the academic year 1979–1980.

That pupil assignment plan generated a controversy which was resolved by this court making its own determinations with the expressed reservation that what was ordered was to be considered only an interim action required to meet an existing emergency. It was recognized that Resolution No. 2060 directed that additional study be made before any more school closings, consolidations or new construction were undertaken. It was also observed that a hoped for residential growth with natural integration could be assisted and advanced by creative new proposals for educational enhancement during the time of transition. I indicated a willingness to consider such proposals.

Shortly after the entry of the memorandum opinion and order assigning pupils for the 1979–80 school year, *Keyes v. School District No. 1, Denver, Colorado*, 474

F.Supp. 1265 (D.Colo.1979), the Board of Education passed Resolution No. 2079, creating a Long-Range Planning Committee which produced a report in March, 1980, entitled, "Our Future ... Our Schools" (Defendant's Exhibit C–24), recommending the development of a middle school program and the establishment of a district staff academy. The board adopted those recommendations.

The Denver Board of Education continued its positive response in May, 1980, when it adopted Resolution No. 2110, establishing an "Ad Hoc Committee" to design a new student assignment plan and to develop both a definition of and guidelines for constructing a unitary school system. During subsequent hearings, I encouraged that undertaking and said that it was consistent with an orderly approach to creating the conditions and climate for concluding this litigation.

The Ad Hoc Committee produced a first report which was greeted with a negative response from interested community groups. It then continued the design process, with additional community input. On June 5, 1981, the Ad Hoc Committee presented a final report, setting out a definition of a unitary school system, guidelines for its recognition, and a pupil assignment plan for the implementation of the middle school concept. A copy of that document is in evidence as Defendant's Exhibit D–2. Shortly before the presentation of that report, the regularly scheduled election produced a change in the composition of the school board membership. As it has been since the first court orders in this case, the jingoism of "forced busing" was very prevalent during that political campaign.

Despite their differing views about "busing", all of the school board members worked together in detailed discussions of the Ad Hoc Committee pupil assignment plan during the summer of 1981 and arrived at an informal consensus that the plan should be adopted with some modifications. Before legislative action was taken on that informal consensus, board member William Schroeder proposed a very different approach based upon an open enrollment policy.

On October 30, 1981, the defendant district filed a document entitled "Submission of Plans", with attachments called "Community Neighborhood School Open Enrollment Concept" and "The Denver Public Schools: A Unitary System". The latter document was the consensus plan, dated October 14, 1981. With these papers, the defendant also filed a request that the court establish hearing dates for consideration of the two contrasting "plans"; determine that the district is a unitary system and establish a timetable for relinquishment of jurisdiction.

On November 12, 1981, this court entered an order refusing the request to consider those two proposals and directing the defendant to file a single plan for removal of racial discrimination in public education and the establishment of a unitary school system.

The defendant then filed what has come to be called the "Total Access Plan" which came on for consideration in a two-week hearing which was concluded on March 15, 1982. At that time, I indicated orally that the plan was not acceptable for implementation in the fall of 1982 because it was incomplete, insufficient and unrelated to the realities of the continuing effects of past segregative policies.

The Total Access Plan was submitted by a 4 to 3 majority of a sharply divided board. That plan rejected any responsibility for removing the effects of the past discriminatory dual system. The presenting premise was that a policy of open enrollment, with optional educational opportunities available in magnet schools, would provide a non-racial system with equal opportunity. That is the kind of neutrality which was criticized by the Supreme Court in *Green v. School Board of New Kent County*, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968).

With that lack of concern, there was no commitment to the protection of the interests of racial minorities involved with the Denver school system. The Total Access Plan was a "sink or swim" approach with responsibility for finding access to opportunity placed on the students and their fami-

lies. On the positive side, the expert witnesses who testified at the hearing on the Total Access Plan generally approved of the educational philosophy involved in curriculum diversity and considered it to have considerable potential for enhancement of the quality of education for those students who might be able to participate.

The clearest and most concise criticism of the Total Access Plan came from the defendant's witness, Dr. Charles Willie, who had previously consulted with the Ad Hoc Committee. He applauded the expressed emphasis on quality of education, but found the need to impose constraints to ensure racial diversity along with the educational choices. Accordingly, he opined that the magnet schools must have some racial ratios and that parental choice should be subject to the responsibility of the school board to make the final assignments. More specifically, Dr. Willie advised that the Total Access Plan would be workable only upon a showing that the following factors were present:

1. The assurance of integration in the magnet schools.

2. The assurance of integration in the regular schools.

3. Demonstrated capacity of the transportation element.

4. The assurance of an adequate affirmative action program for the faculty.

5. The assurance of adequate integration in the placement of faculty.

6. An adequate system to provide fairness in disciplinary suspensions and pupil placement in the classroom.

7. The assertion by the board of its ultimate responsibility for making pupil assignments.

8. The assurance of some stability by restricting the frequency with which there can be a change in the choice of schools.

The defendant district has failed to make an adequate showing on any of these factors. The probability that the Total Access Plan would result in resegregation of schools is a fair inference from the facts that most of the students would be served by regular schools; that the regular schools must be equal in the quality of their curriculum; that housing patterns in Denver continue to be segregated; and that most families would choose to have their children attend the nearest school.

In summary, the Total Access Plan was lacking in concern, commitment and capacity.

Following the announced rejection of the Total Access Plan, the Denver Board of Education adopted another plan by a 6 to 1 vote. That plan, dated March 30, 1982, is in evidence as Defendant's Exhibit F–1. Essentially, it is the consensus plan of October 14, 1981, with two magnet school elements from the Total Access Plan. Those are the Gilpin Extended Day Program and the Fundamental Academy at Knight Elementary School.

An evidentiary hearing was held on this modified consensus plan, and it has been compared with an alternative pupil assignment plan presented by the plaintiffs. The essential difference in the two plans now before the court is that the plaintiffs' plan is more faithful to the ± 15% anglo population guideline. The consensus plan carries that guideline to its extreme limits in many schools, and it avoids it in some others. Accordingly, if adherence to a racial ratio is required by the Constitution, the consensus plan is inadequate.

■ The Constitution does not compel the constant application of racial ratios for every school in the district. That would require continual realignment of the kind criticized in *Pasadena City Board of Education v. Spangler*, 427 U.S. 424, 96 S.Ct. 2697, 49 L.Ed.2d 599 (1976). While racial ratios are not the prescribed measure of equal educational opportunity, they are certainly a relevant factor. Schools which are racially isolated with minority student populations tend to become stigmatized and inadequate. Whether one or more such schools creates an inherently unequal opportunity depends upon many variables which are associated with the reasons why the particular schools have their racial identity. *Swann v. Charlotte-Mecklenburg Board of Education*, 402 U.S. 1, 24, 91 S.Ct. 1267, 1280, 28 L.Ed.2d 554 (1971).

■ If done by design, there is an illegal discriminatory intent. If they are created by transitory circumstances which can be expected to change, and if the attending student population has other opportunities for a more diversified experience during the total time of attendance within the system, a limited number of such schools can be tolerated.

■ In this case, I am now accepting the modified consensus plan for the single school year of 1982–83. I do so with considerable reservation because I am not convinced that the incumbent school board has shown a commitment to the creation of a unitary school system which will have adequate capacity for the delivery of educational services without racial disadvantages.

The consensus plan is an expedient which will accommodate the educational policy decision to move to middle schools and which will attenuate the divisive effects from the factionalism found in the present board of education. The positive element in this plan is that it reflects a consensus of the views of the board members. Acceptance of this plan for a single school year is not to be construed as an abdication of this court's authority and responsibility to compel compliance with the desegregation mandate.

■ The teaching of the Supreme Court opinion deciding *Milliken v. Bradley*, 433 U.S. 267, 97 S.Ct. 2749, 53 L.Ed.2d 745 (1977) is that federal courts are required to focus upon three factors in exercising the equitable principles applicable to the desegregation remedy. First, the nature of the remedy is determined by the nature and scope of the constitutional violation. Second, the decree must be remedial in nature. Third, the courts must consider the interests of local authorities in managing their own affairs consistent with the Constitution. *Id.* at 280–81, 97 S.Ct. at 2757.

■ What is most disquieting about the history of the remedy phase of this case is that the adjudicated constitutional violation was the isolation of racial minorities through the manipulation of school attendance zones and the placement of new facilities. All subsequent school board decisions on those aspects are made suspect by that past conduct, and the present school board's majoritarian representation cannot be permitted to retreat from the responsibility to remedy the effects of the discriminatory policies of previous boards. Harmony in the community cannot be achieved by harming the interests of those whose lives are burdened by the brands of minority grouping labels.

One of the reasons for my rejection of the submission of two plans on October 30, 1981, was that those two plans were quite different in concept. The adoption of the modified consensus plan does not eliminate the confusion about the direction which the school board desires to take. Is it neighborhood schools, or is it freedom of choice among a variety of educational experiences? What are the long-range goals for new facilities construction? Of particular concern is the future of the Montbello area. Are the magnet school programs for Gilpin and Knight a signal that the board wishes to pursue the policy of providing diversity in the educational programs? How will the district protect against segregation in these two magnet schools and how will the implementation of the programs in these schools be incorporated into the total school system?

These uncertainties compel the conclusion that court approval of the modified consensus plan requires a corresponding increased involvement in the affairs of the Denver Public School System. It will ₒe necessary to monitor and evaluate developments in a more substantive manner to ensure that the remedy of the effects of past racial discrimination will not be retarded by any reformation of educational policy, programs and practices.

■ In announcing my rejection of the Total Access Plan, I said the time had come to establish some benchmarks to guide this school district in the future. As a first step, it may be helpful to announce a working definition of a unitary school system. I accept the suggestions of the Ad Hoc Committee. A unitary school system is one in which all of the students have equal access to the opportunity for education, with the publicly provided educational resources dis-

tributed equitably, and with the expectation that all students can acquire a community defined level of knowledge and skills consistent with their individual efforts and abilities. It provides a chance to develop fully each individual's potentials, without being restricted by an identification with any racial or ethnic groups.

I also view favorably the criteria for measuring the extent to which a school system is moving toward or away from that goal expressed in the guidelines developed by the Ad Hoc Committee. (Defendant's Exhibit D-2, pp. 17-68).

Making these measurements is considerably more difficult than taking body counts in school buildings. It requires some expertise in several disciplines and it can best be done by those who have the ability to communicate with the administrative and teaching staff in the language of professional educators. It also requires careful and consistent monitoring. The adversary system developed for the litigation of disputed facts was not designed for such supervision of the remedial phase of a lawsuit. During the past six years, I have relied greatly upon the work of the dedicated people who have served on the Community Education Council to oversee desegregation in the Denver school system. Those people deserve public acclamation for their efforts and they have achieved commendable results. I am grateful to each person who has served in that capacity.

What will be required for the future is work which is beyond the capacity of a citizens' group. Accordingly, I am disbanding the Community Education Council at the close of this school year. To replace that group, I will establish a panel of experts to be appointed under the authority of Rule 706 of the Federal Rules of Evidence. Counsel will have an opportunity to participate in the selection of those persons.

Because of the reservations and concerns expressed in this memorandum opinion and because approval for implementation of the modified consensus plan is only another interim expedient, it is apparent that additional hearings will be required. It is also obvious that this court must establish a timetable for the district to proceed with further development of plans and programs. Additionally, further details on the Gilpin and Knight school programs must be submitted for approval and it may well be that some standard should be established to enable the school district to make minor changes in the pupil assignment plan for the coming academic year without the necessity for formal submission to this court. For these reasons, a hearing should be convened with an open agenda for counsel to state their views and make suggestions consistent with the views expressed in this opinion. Accordingly, it is

ORDERED, that the defendant School District No. 1 may proceed with the implementation of the pupil assignment plan described in Defendant's Exhibit F-1 for the school year 1982-1983.