**Wilfred KEYES, et al., Plaintiffs,**

**Congress of Hispanic Educators, et al., Plaintiff-Intervenors,**

**v.**

**SCHOOL DISTRICT NO. 1, DENVER, COLORADO, et al., Defendants.**

**Civ. A. No. C–1499.**

United States District Court, D. Colorado.

June 3, 1985.

Gordon G. Greiner, Holland & Hart, Denver, Colo., James M. Nabrit, III, New York City, for plaintiffs.

Norma V. Cantu, Morris J. Baller, Mexican American Legal Defense and Educational Fund, San Francisco, Cal., Kenneth Siegel, Kenneth Salazar, Sherman & Howard, Denver, Colo., for plaintiff-intervenors.

Michael H. Jackson, Semple & Jackson, Denver, Colo., Phil C. Neal, Friedman & Koven, Chicago, Ill., for defendants.

Wm. Bradford Reynolds, Asst. Atty. Gen., Charles J. Cooper, Deputy Asst. Atty. Gen., Hugh Joseph Beard, Jr. and Michael Carvin, Attys., Civil Rights Div., U.S. Dept. of Justice, Washington, D.C., Robert N. Miller, U.S. Atty., Denver, Colo., amicus curiae.

## MEMORANDUM OPINION AND ORDER

MATSCH, District Judge.

The Board of Education of School District No. 1 seeks to end this case by moving for a determination that the District has provided an equal educational opportunity for all students and has remedied all past failures to comply with the requirements of the United States Constitution. More particularly, the matter now before this court is a motion, filed January 19, 1984, for entry of the following orders:

1. An order declaring that the Defendant School District is a unitary school system in the following respects: a) Faculty, b) Staff, c) Transportation, d) Extracurricular Activities, e) Facilities, and f) Composition of Student Body.

2. An order modifying and dissolving the injunction as it relates to the assignment of students to schools.

3. An order declaring that the remedy previously ordered in this case to correct the Constitutional violation as found has been implemented, and that there is no need for continuing court jurisdiction in the matter.

The purpose of the motion is set forth in the following paragraphs from it:

Throughout the proceedings herein, the Court has urged upon the parties the need to develop and define a process and procedure whereby the Court and the parties might have the opportunity to present evidence to the Court on the unitary nature of the district and the extent of the School District's compliance with the remedial orders of the Court, and for the need, if any, for continuing court jurisdiction over the affairs of School District No. 1.

The earliest definitions of a unitary school system enunciated six criteria to be considered by a court in its determination of whether a school system was dual or unitary. They included: Faculty, Staff, Transportation, Extracurricular Activities, Facilities, and Composition of Student Body. *Green v. County School Board,* 391 U.S. 430, 435 [88 S.Ct. 1689, 1692, 20 L.Ed.2d 716] (1968) An analysis has been conducted by staff utilizing the criteria as set forth above, and the working definition of the unitary school system, as announced by this Court in its Memorandum and Opinion dated May 12, 1982. The School District is prepared to show to the Court its compliance with the criteria and with the Court's definition at an evidentiary hearing for that purpose.

Although the parties to the litigation have been before the Court on numerous occasions with respect to proposed changes in the orders as they relate to matters of pupil assignment, none of these hearings were designed to permit the parties to explore the extent to which the School District has fulfilled its remedial obligations; and, as a result, neither the parties nor the Court have had a full opportunity to examine the data and the evidence that bears upon the question of whether the School District has in fact fully implemented the court ordered remedy and that the remedy has accomplished its purpose.

The requested full evidentiary hearing was held in May, 1984, and the plaintiffs, defendants and intervenors have filed comprehensive briefs. The United States Department of Justice has also filed both pre-trial and post-trial memoranda as amicus curiae. The court is fully informed on the issues and arguments relevant to the motion.

## GENERAL PRINCIPLES

The parties approach the issues and evidence in this case from different perspectives reflecting differing interpretations of the scope of the equal protection clause. Perhaps, as with visual perspectives, the difference is influenced by the relative positions of the parties. The Board of Education looks at the case from the high ground occupied by those holding the power of governance. In that position there may be a tendency to accept a more static overview of a somewhat distant scene characterized by stability and serenity. The plaintiffs/intervenors represent people whose historical disadvantages give them an alternate viewpoint. For those who are still deep in the valley, struggling for survival, and for those moving upward on the mountain, educational opportunity is the path to progress. They are on the move, seeing only transient scenery, and their primary concern is the direction of their movement. Is the trail going forward and upward, or downward and backward?

The difference between the parties may also be illustrated with a different analogy. The defendants ask that we look at the Denver school system by making detailed comparisons of enlarged aerial photographs taken in 1976 and 1984. The plaintiffs/intervenors ask us to view a movie film record of events from 1968 to 1984, with close-ups of a few of the frames at

different intervals. The choice turns on conflicting interpretations of constitutional law based on alternative approaches in analyzing Supreme Court opinions.

That process of interpretation of constitutional law will also be affected by methodology in establishing viewpoint. Does one plumb the depths of the relevant opinions as a series of pools, or is it more appropriate to look at the Court's language as the flow of a meandering stream with eddies, backwaters and even changes of direction? The latter view is more consistent with the guiding role of the Court.[1] School desegregation cases differ from most litigation in that much of the evidence is developed while the case is in court. In most lawsuits, the court's focus is retrospective. The issues arise from historical events and the evidentiary disputes are resolved by the court's findings of the probabilities about matters which occurred in the past. In school desegregation cases, there are political and demographic changes which occur while the case is in court and even the court's processes and decrees—at least the public perception of them—can be factors influencing some of those changes. It is also important to remember that the applicable principles of constitutional law have evolved under circumstances of change in the characteristics of our national community and in the course of developing new information and understanding about sociology and psychology.

Only 128 years ago, the Supreme Court asked:

> The question is simply this: Can a negro, whose ancestors were imported into this country, and sold as slaves, become a member of the political community formed and brought into existence by the Constitution of the United States, and as such become entitled to all the rights, and privileges, and immunities, guarantied by that instrument to the citizen? One of which rights is the privilege of suing in a court of the United States in the cases specified in the Constitution.

*Dred Scott v. Sandford,* 60 U.S. (19 How) 393, 403, 15 L.Ed. 691 (1856).

The Court sought justification for its negative answer by finding that the founding fathers did not intend to recognize slaves or their descendants as citizens. Chief Justice Taney made the following observation about the status of Negroes at the time of adoption of the Declaration of Independence and the Constitution:

> They had for more than a century before been regarded as beings of an inferior order, and altogether unfit to associate with the white race, either in social or political relations; and so far inferior, that they had no rights which the white man was bound to respect; and that the negro might justly and lawfully be reduced to slavery for his benefit. He was bought and sold, and treated as an ordinary article of merchandise and traffic, whenever a profit could be made by it. This opinion was at that time fixed and universal in the civilized portion of the white race. It was regarded as an axiom in morals as well as in politics, which no one thought of disputing, or supposed to be open to dispute; and men in every grade and position in society daily and habitually acted upon it in their private pursuits, as well as in matters of public

---

**1.** *See Brown v. Board of Education,* 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083 (1955) (*Brown II*):

> The opinions of [*Brown*], declaring the fundamental principle that racial discrimination in public education is unconstitutional, are incorporated herein by reference.

> .  .  .  .  .

> Full implementation of these constitutional principles may require solution of varied local school problems. School authorities have the primary responsibility for elucidating, assessing, and solving these problems; courts will have to consider whether the action of school authorities constitutes good faith implementation of the governing constitutional principles. Because of their proximity to local conditions and the possible need for further hearings, the courts which originally heard these cases can best perform this judicial appraisal.

*Id.* at 298, 75 S.Ct. at 755 (footnote omitted). *See, also* Schauer, *Refining the Lawmaking Function of the Supreme Court,* 17 U.Mich.L.J. Ref., 1–24 (1984).

concern, without doubting for a moment the correctness of this opinion.

And in no nation was this opinion more firmly fixed or more uniformly acted upon than by the English Government and English people. They not only seized them on the coast of Africa, and sold them or held them in slavery for their own use; but they took them as ordinary articles of merchandise to every country where they could make a profit on them, and were far more extensively engaged in this commerce than any other nation in the world.

The opinion thus entertained and acted upon in England was naturally impressed upon the colonies they founded on this side of the Atlantic. And, accordingly, a negro of the African race was regarded by them as an article of property, and held, and bought and sold as such, in every one of the thirteen colonies which united in the Declaration of Independence, and afterwards formed the Constitution of the United States.

*Id.* 60 U.S. at 407–8.

The *Dred Scott* opinion was, of course, reversed by the adoption of the Thirteenth and Fourteenth Amendments to the United States Constitution after the Civil War. Yet, the power of the continuing public perception of inferiority of Blacks was reflected in the adoption of the "separate but equal doctrine" in *Plessy v. Ferguson,* 163 U.S. 537, 16 S.Ct. 1138, 41 L.Ed. 256 (1896). There, the majority of the Supreme Court approved a Louisiana statute requiring separation of white and "colored" races in railroad coaches with the following language:

The object of the [Fourteenth] amendment was undoubtedly to enforce the absolute equality of the two races before the law, but in the nature of things it could not have been intended to abolish distinctions based upon color, or to enforce social, as distinguished from political equality, or a commingling of the two races upon terms unsatisfactory to ei-

ther. Laws permitting, and even requiring, their separation in places where they are liable to be brought into contact do not necessarily imply the inferiority of either race to the other, and have been generally, if not universally, recognized as within the competency of the state legislatures in the exercise of their police power. The most common instance of this is connected with the establishment of separate schools for white and colored children, which has been held to be a valid exercise of the legislative power even by courts of States where the political rights of the colored race have been longest and most earnestly enforced.

*Id.* at 544, 16 S.Ct. at 1140.

The force of that assumption of inferiority is reflected in these words from the dissenting opinion of Justice Harlan:

The white race deems itself to be the dominant race in this country. And so it is, in prestige, in achievements, in education, in wealth and in power. So, I doubt not, it will continue to be for all time, if it remains true to its great heritage and holds fast to the principles of constitutional liberty.

*Id.* at 559, 561, 16 S.Ct. at 1146, 1147.

In *Brown v. Board of Education,* 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), the Supreme Court took notice of the historical experience of the Negro in America, and it was that history of racial disadvantage in our social, economic and political life which formed the predicate for the conclusion that racially-segregated schools are inherently unequal. In overruling *Plessy v. Ferguson,* the Supreme Court made a fundamental change in the interpretation and application of the equal protection clause of the Fourteenth Amendment. Departing from its past practice of deciding such issues by discoursing on political theory, the Court considered evidence of the actual effects of racial separation well beyond the record before it, using secondary sources of information.[2] Thus, in af-

---

**2.** The Court's use of matters of common knowledge concerning broad societal patterns was de-

fended in Black, *The Lawfulness of the Segrega-*

firming the Kansas case finding that segregation has a detrimental effect upon Negro children, the Court said:

> Whatever may have been the extent of psychological knowledge at the time of *Plessy v. Ferguson,* this finding is amply supported by modern authority.

*Brown,* 347 U.S. at 494, 74 S.Ct. at 692 (footnote omitted). The footnote for that statement referred to several publications, including E.F. Frazier, *The Negro in the United States,* 674–681 (1949). The following passages appear in that work:

> The theory of separate but equal educational and other facilities has never worked out in practice. Separate education for Negroes has always meant inferior schools and inferior teaching personnel for Negro children. Inferior schools have caused a high rate of illiteracy to continue among Negroes since Emancipation. The resulting mental isolation of Negroes which continued a half century was only partially broken down by the mass migrations of Negroes to northern cities during and following World War I. Because of the discriminations in regard to employment the Negro has been kept in the lowest paid and unskilled occupations, and thus there has been no premium placed upon exceptional skill and talent among Negroes.
>
> . . . .
>
> ... Consequently, the Negro has never been permitted to achieve the full stature of a man through competition with whites. Many of his leaders have owed their pre-eminence to the fact that they have played the role of mediators in a pattern of race relations based upon the economic dependence and social subordination of the Negro. The dominant white interests have singled out mediocre Negroes for the role of "great Negroes," while Negroes of superior mental endowment and courage have been crushed as irresponsible radicals. Thus a factual and objective basis for the charge that the Negro is a "child" race has been provided in the whole system of racial discrimination. It is no wonder that since the Negro has been treated and regarded as a "child" race, whites have not taken him seriously. In fact, as the result of the system of discrimination, the Negro has not been permitted to play a serious role in the economic and social life of the nation.

*Id.* at 674–677.

Another of the publications cited in that footnote is G. Myrdal, *An American Dilemma: The Negro Problem and Modern Democracy* (1944) which includes the following observations:

> But when segregation and discrimination are the outcome of individual action, the second main norm of the American Creed, namely, **liberty**, can be invoked in their defense. It must be left to the individual white man's own discretion whether or not he wants to receive Negroes in his home, shake hands with them, and eat with them. **If upheld solely by individual choice**, social segregation manifested by **all** white people in an American community can be—and is—defended by the norm of personal liberty. When, however, legal, economic, or social sanctions are applied to enforce conformity from **other** whites, and when Negroes are made to adjust their behav-

---

*tion Decisions,* 69 Yale L.J. 421 (1960). Professor Black wrote:

> The case seems so onesided that it is hard to make out what is being protested against when it is asked, rhetorically, how the Court can possibly advise itself of the real character of the segregation system. It seems that what is being said is that, while no actual doubt exists as to what segregation is for and what kind of societal pattern it supports and implements, there is no ritually sanctioned way in which the Court, as a Court, can permissibly learn what is obvious to everybody else and to the Justices as individuals. But surely, confronted with such a problem, legal acumen has only one proper task—that of developing ways to make it permissible for the Court to use what it knows; any other counsel is of despair. And, equally surely, the fact that the Court has assumed as true a matter of common knowledge in regard to broad societal patterns, is (to say the very least) pretty far down the list of things to protest against. *Id.* at 427–428.

ior in response to **organized** white demands, this violates the norm of personal liberty. In the national ideology, the point where approved liberty changes into disapproved restriction on liberty is left somewhat uncertain. The old liberal formula that the individual shall be left free to follow the dictates of his own will so long as he does not substantially hamper the liberty of other persons does not solve the problem, because it is not definite enough. As remarked in an earlier chapter, the American Creed is in a process of change from "rugged individualism." It is giving increasing weight to "the other fellow's" liberty, and thus narrowing the scope of the actions which become condoned by the individualistic liberty formula. (emphasis in original)

To apply the American value premises in this condition of internal conflict within the concept of liberty itself—which is only another aspect of its external conflict with the concept of equality—stress has to be laid on the actual amount of discrimination. When there is substantial discrimination present, liberty for the white person has to be overruled by equality. *To discern discrimination we must take into account the indirect effects of segregation in terms of cultural isolation, political and legal disabilities, and economic disadvantages, which are often much more important than the direct social discrimination.* (emphasis added)

*Id.* at 573–574.

The impact of the *Brown* decision was felt far beyond the schools. In a firm and consistent line of decisions, the ruling was extended to prohibit public segregation of other public facilities, such as transportation systems, *Gayle v. Browder,* 352 U.S. 903, 77 S.Ct. 145, 1 L.Ed.2d 114 (1956); parks and playgrounds, *New Orleans City Park Improvement Ass'n v. Detiege,* 358 U.S. 54, 79 S.Ct. 99, 3 L.Ed.2d 46 (1958), *Wright v. Georgia,* 373 U.S. 284, 83 S.Ct. 1240, 10 L.Ed.2d 349 (1963), *Watson v. Memphis,* 373 U.S. 526, 83 S.Ct. 1314, 10 L.Ed.2d 529 (1963); golf courses, *Holmes v. City of Atlanta,* 350 U.S. 879, 76 S.Ct. 141, 100 L.Ed. 776 (1955); beaches and bath houses, *Mayor of Baltimore v. Dawson,* 350 U.S. 877, 76 S.Ct. 133, 100 L.Ed. 774 (1955); auditoriums, *Muir v. Louisville Park Theatrical Ass'n,* 347 U.S. 971, 74 S.Ct. 783, 98 L.Ed. 1112 (1954); courthouses, *Johnson v. Virginia,* 373 U.S. 61, 83 S.Ct. 1053, 10 L.Ed.2d 195 (1963); parking garages, *Burton v. Wilmington Parking Authority,* 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961); and airports, *Turner v. City of Memphis,* 369 U.S. 350, 82 S.Ct. 805, 7 L.Ed.2d 762 (1962). *See also, Loving v. Virginia,* 388 U.S. 1, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1966) (striking down state miscegenation laws.) "The principles announced in [*Brown* ] ... according to the command of the Constitution, are indispensible for the protection of the freedoms guaranteed by our fundamental charter for all of us. Our constitutional ideal of equal justice under law is thus made a living truth." *Cooper v. Aaron,* 358 U.S. 1, 19–20, 78 S.Ct. 1401, 1410, 3 L.Ed.2d 5 (1958).

In this very civil action, the Supreme Court formally recognized that Hispanos suffered from much of the same economic and cultural deprivations. *Keyes v. School District No. 1, Denver, Colo.,* 413 U.S. 189, 197, 93 S.Ct. 2686, 2691, 37 L.Ed.2d 548 (1973). Indeed, the Court made the following specific determination with respect to the Denver, Colorado community at page 198 of the opinion:

[T]hough of different origins, Negroes and Hispanos in Denver suffer identical discrimination in treatment when compared with the treatment afforded Anglo students. In that circumstance, we think petitioners are entitled to have schools with a combined predominance of Negroes and Hispanos included in the category of "segregated" schools.

Perhaps much of the confusion, controversy and continuing litigation which has occurred nationally in the 31 years since *Brown,* and locally in the 12 years since *Keyes,* have been caused by a failure to appreciate the Court's connection of school policy with national history. It is not that the schools have been singled out as experi-

mental vehicles to redress all of the past injustice and inequity suffered by racial minorities; it is that the courts have prohibited school officials from perpetuating the disadvantages caused by past practices of the larger society.

The reason that racial separation in public schools is a denial of equal protection of the laws in contravention of the restraint of the Fourteenth Amendment is that in 1954, and 1973, and still today, the Anglo, the Black and the Hispano continue to occupy different positions in our pluralistic nation. To find segregative intent, it is not necessary to find that an act or omission resulted from bad purpose or evil motive; it is sufficient if it reflects a disparate perception of relative worth. The attitude of neutrality characterized by the newly popular phrase "color blindness" avoids the obligation to recognize the continuing effects of past prejudices, practices and passions.

■ Stripped of all legalese, the present state of the law is that whatever other disadvantages may be visited upon an individual in the accident of birth, the Constitution prohibits any governmental use of race, color or ethnicity to impose an impediment to the seeking of benefits of public educational services.

The scientific community continues to find significant evidence to suggest that each human being may be predestined by an individual genetic code in very significant ways. These individual differences may be influences on mental and physical development, behavioral adjustment and risk factors for disease, all independently of race, sex or other group characteristics. These findings of physical science compel a reading of the "self-evident truth" that "all men are created equal," to mean that the government must act "as if" each person has equal potential for achievement. No school policy and no court order can assure any particular level of success in public schools any more than in any other aspect of life. Individual students will flunk, become disciplinary problems, drop out or otherwise fail to meet expectations for rea-

sons wholly unrelated to race, ethnicity, and environment. The true causes for those results are properly matters of interest to educators, sociologists, psychologists, physicians and other disciplines. Neither cause nor effect can be used in applying constitutional principles.

Stated as a prohibitive, what the Constitution requires is that the government must not itself act as an agent of predestination in association with any immutable characteristics of birth. There is no scientific evidence to suggest that such group characteristics as race or ethnicity are limiting factors on any individual. To the extent that race is a disadvantage, it is the result of prejudices, attitudes and historical deprivation. Data suggesting different achievement levels according to race are relevant only as circumstantial evidence of the effects of discriminatory attitudes and practices. To escape the intangible effects of any stereotyping or latent bias, government officials must avoid the use of racial identifications in acting on public issues. That is true whether government acts to regulate and restrict conduct or to provide services such as educational opportunity.

### THE DEFENDANTS' POSITION

The defendants' carefully constructed argument in support of the subject motion has the appeal of logic. Stated succinctly at page 2 of the defendants' post-trial brief, the contention is this:

Once a school district has complied with a constitutionally-acceptable court-ordered remedy that is designed to desegregate the system in the full sense, and has maintained substantial compliance with that remedy for a sustained period of time, the school district is entitled to be declared unitary unless there have been intervening acts of discrimination.

The prime thesis of this argument is that this court's 1974 Final Judgment and Decree, as modified in 1976, was a complete remedy for all of the constitutional violations found in this case. The validity of that thesis is critical to the contention that by complying with the requirements of that

Decree the District established a unitary school system.

What was to be remedied? Simply put, what was required was the reversal and eradication of the effects of a policy of geographical containment of Black people in an area of northeast Denver. For almost ten years the members of the Board of Education tried to keep Black families out of the White residential neighborhoods east of Colorado Boulevard by manipulating attendance areas, designing new school construction, installing mobile classroom units, and steadfastly refusing to relieve overcrowding of Black schools. This policy was at work in 1960 when Barrett School was constructed as a relatively small school building with an attendance zone entirely in the Black community, even though a White school located only a few blocks away was operating at 20% over capacity. It was apparent that Barrett, Stedman, Park Hill, Philips and Hallett Elementary Schools were designed for attendance of Black pupils. Mobile units and additional classroom construction were used to expand the capacity of those schools while preserving the Anglo character of the schools to the east of them. The continued use of that segregative policy was clearly the will of the electorate. When a slim majority of the Board adopted resolutions in 1969 to attempt to alleviate the segregative effects of this policy by reassigning some students and transporting them out of racially separated neighborhoods, the people of Denver overwhelmingly repudiated that action by defeating two of the most articulate Board members and replacing them with new members who vowed to reverse those resolutions. When those promises were kept, the plaintiffs came to this court, seeking a preliminary injunction in 1969.

Through all of the intervening years, the court and the parties have struggled with two elusive and intractable questions. How did that policy of containment in northeast Denver affect the Denver Public School System as a whole? What is required to remove those effects? Those questions have caused this case to be con-

sidered by two judges in this court, the judges of the Tenth Circuit Court of Appeals, and the Justices of the Supreme Court of the United States. A third question, which has been lurking in the shadows, now comes to the spotlight. What must be done to protect against future resegregation and a return to a dual system?

It is the law of this case that the 1974 Final Judgment and Decree was not an adequate remedy for segregated school assignments. The Tenth Circuit Court of Appeals in *Keyes v. School Dist. No. 1, Denver, Colo.*, 521 F.2d 465 (10th Cir.1975), *cert. denied*, 423 U.S. 1066, 96 S.Ct. 806, 46 L.Ed.2d 657 (1976), faulted the court plan for pupil assignment because it used only part-time pairing. The appellate court said:

> We hold that the part-time pairing component of the court's remedy for desegregation of elementary schools *is not constitutionally acceptable as a basic and permanent premise for desegregation but deem that practicality negates the necessity of invalidating in toto this aspect of the trial court's judgment at this time.* We read this innovation as recognized by the trial court as an adjunct to be tolerated only as such under the temporary conditions of the present and as a step toward total integration.

Although the district court's remedial discretion is broad, it is ·necessarily bounded by the constitutional requirement that the court make "every effort to achieve the greatest possible degree of actual desegregation, taking into account the practicalities of the situation." *Davis v. B'd of School Commissioners of Mobile County*, 402 U.S. 33, 37, 91 S.Ct. 1289, 1292, 28 L.Ed.2d 577. In examining the record and the district court's opinion, we find no insurmountable practical impediment to full-time desegregation. Indeed both the court and its consultant Dr. Finger were of the view that part-time classroom pairing would easily convert to a full-time program. The court's part-time plan offers some of the most severely segregated schools in the

district only part-time desegregation; of the eighteen predominantly minority schools in the part-time program, thirteen have projected enrollments of less than ten percent Anglo pupils. Under the circumstances a partial solution for these schools is not enough.

*Id.* at 477–478 (emphasis added) (footnote omitted).

The Tenth Circuit also faulted the district court's plan for leaving Boulevard, Cheltenham, Del Pueblo, Elyria and Garden Place as segregated Hispano schools, and reversed the conclusion that remedial education was an acceptable substitute for reassignment of students. With respect to those schools, the Court remanded with the following instruction:

> We therefore remand this portion of the case for a determination whether the continued segregation of students at the five mentioned schools may be justified on grounds other than the institution and development of bilingual-bicultural programs at the schools. "The district judge ... should make every effort to achieve the greatest possible degree of actual desegregation and will thus necessarily be concerned with the elimination of one-race schools." *Swann, supra,* 402 U.S. at 26, 91 S.Ct. at 1281.

*Id.* at 480.

The establishment of the East-Manual complex was also reversed. Finally, the appellate court affirmed the district court's requirements with respect to the desegregation of faculty and staff, using the following language:

> During the 1973–74 school year, disproportionate numbers of the Denver school system's minority teachers were assigned to schools with high concentrations of minority students. Despite the District's institution of a minority recruitment program in recent years, the percentage of minority faculty members in the system has not increased appreciably. Of the view that faculty desegre-

gation is essential to the process of school desegregation, *the district court ordered the District to assign its personnel so that, in each school, the ratio of minority teachers and staff to Anglo teachers and staff shall not be less than 50% of the ratio of minority to Anglo staff in the entire system.* The School Board does not dispute the propriety of this component of the court's remedy.

. . . .

> Contrary to the School Board, we believe that these measures to ensure faculty desegregation were properly part of the court's order. *Faculty and staff desegregation is an "important aspect of the basic task of achieving a public school system wholly free from racial discrimination."* (citations omitted) ... We believe that the court's faculty and staff desegregation orders were proper and we affirm.

*Id.* at 484 (footnotes omitted) (emphasis added).

The March 26, 1976 Order, entered by Judge Doyle, approved the use of an agreed plan in response to the mandate of the Court of Appeals. It is clear, however, that future change was expected because the court said:

> The School Board, in Resolution 1897, has requested that no changes be made in student school assignments for three years; this in the interest of continuity and stability. In the court's view the objective is good with the exception that some flexibility should be retained so as to make adjustments for substantial population changes.

Additionally, the issue of bilingual education was left open. At that time, it was expected that a stipulated proposal for the modification of the bilingual program would be immediately forthcoming.[3]

This court honored the request to avoid altering the student assignment plan for a

---

**3.** In fact these issues were litigated at length in May, 1982, resulting in the Memorandum Opinion and Order on Language Issues which appears as *Keyes v. School Dist. No. 1, Denver, Colo.,* 576 F.Supp. 1503 (D.Colo.1983).

period of three years, and the only changes made were those requested by the District for the limited circumstances of particular situations. To plan for declining pupil enrollment and consequent excess plant capacity, in 1977 the Board of Education appointed an advisory committee of citizens to study the utilization of school buildings and to recommend criteria for closures and consolidations. That committee made a report which was accepted by the Board in April, 1978. The committee did not contemplate action to make changes before September, 1981. The Board changed that time to September, 1980. After the Community Education Council, a court-appointed monitoring group, expressed concerns that imbalances in racial composition and crowded conditions had developed in some schools, hearings were held in this court in January, 1979 to consider the status of those schools.

At that time the court was informed that the Board of Education had directed the filing of a report by an Administration Task Force on school closings and school assignments in March, 1979. Accordingly, the court set May 1, 1979 as the date for the filing of a comprehensive student assignment plan, and set June 1, 1979 as a date to report on the status of compliance with orders requiring affirmative action in the hiring, assignment and in-service training of teachers, administrators and staff. A new plan, adopted in Resolution No. 2060, met opposition from the plaintiffs/intervenors and, accordingly, a further hearing was held on July 20, 1979 on the motion of the defendant School District No. 1 to implement those portions of Resolution No. 2060 dealing with school closings and pupil assignments for the school year 1979–1980.

No one suggested then that this court did not have jurisdiction to modify the 1976 pupil assignment plan. Moreover, while the Board wanted to close four schools, it failed to take any action to consider the objections and concerns which had been expressed at the hearing. The Board members simply did not meet in legislative session, and left it to this court to make the necessary changes in pupil assignments.

That dereliction of the Board's duty permitted its members to avoid criticism from the community, and positioned them to continue their popular protest of judicial intervention into local self-governance.

This court addressed the question of the extent of desegregation which existed in 1979 in the Memorandum Opinion and Order which appears as *Keyes v. School Dist. No. 1, Denver, Colo.,* 474 F.Supp. 1265 (D.Colo.1979). The court noted that the Board of Education and administration recognized that Gilpin, Fairview and Greenlee Elementary Schools had not met the desegregation guidelines, and said:

What is now needed is recognition by the Board of Education, school administration, and staff that they have not yet established a unitary, non-racial school system in Denver, Colorado and that they have a legal obligation to demonstrate to this court that they are taking appropriate action to reach that result.

*Id.* at 1272.

This court then adopted the plaintiffs/intervenors' proposal for the reassignment of students from the closed Ellsworth Elementary School; made its own reassignment of students from the closed Emerson Elementary School; made assignments to the new McKinley-Thatcher School; rejected the Board's proposed removal of Ashley mobile units; approved the reassignment of pupils from closed Elyria Elementary School; adjusted the attendance zone of Belmont School; adjusted the Fairview-Greenlee-Traylor grouping by pairing Fairview and Rosedale; and authorized the establishment of an Oakland-McGlone pair. There was no adjustment for Gilpin and Mitchell, which remained segregated schools.

There was no appeal from the 1979 Order. To the contrary, the court's view that unitary status had not been achieved appeared to have been accepted when the Board appointed an Ad Hoc Committee in May, 1980 to create a definition of a unitary system and to develop guidelines for its identification. That action was taken by

Resolution No. 2110, which included the charge that the Ad Hoc Committee should also design a new student assignment plan for pupil assignments to elementary and middle schools based on demographic data which had been presented to the Board by the long-range planning committee in March, 1980.

The long-range planning committee had been created by Resolution No. 2079 in August, 1979. Its report recommended developing a middle school program, eliminating junior high schools and establishing four-year senior high schools. That educational change required reassignment of all ninth grade pupils, thereby disrupting the existing attendance zones. Accordingly, the work of both committees converged.

The Ad Hoc Committee's pupil assignment proposal was the subject of detailed study by the Board of Education during the summer of 1981. Despite a division on the issue of "busing," the Board developed a student assignment plan. It was submitted to this court along with an alternative open enrollment plan approved by a divided vote and without staff study. In the "Submission of Plans" filed October 30, 1981, the District said:

> PURSUANT to the action of the Board of Education, School District No. 1, . . . submits the attached proposals entitled, *Community Neighborhood School Open Enrollment Concept*, and *The Denver Public Schools: A Unitary System*, to the Court for its consideration.

At the time the Board directed the submission of these proposals, the following motion was adopted:

> That the Board of Education submit to the United States District Court, for its consideration, the proposals entitled, *Community Neighborhood School Open Enrollment Concept* and *The Denver Public Schools: A Unitary System,* as developed by the Board of Education with the following recommendations:
>
> A. The *Community Neighborhood School Open Enrollment Concept* plan is the desirable plan.

> B. If the Court insists on the maintenance of pupil assignments which are based upon the racial and ethnic identification of students, the Board submits the alternate plan for the Court's consideration provided, however, that in those instances where schools are paired, that the Court authorize the discontinuance of the pairing and return of the paired schools to neighborhood schools at such time as the racial and ethnic percentages within the paired schools fall within a range of 20–63% Anglo.

*　　*　　*　　*　　*　　*

> That following submission of the plans, that the Court determine that with the implementation of either plan, that the School District is a unitary school system and establish a specific timetable for the relinquishment of the Court's jurisdiction.

Upon this court's refusal to choose between two such dramatically divergent approaches, the Board submitted the open enrollment concept in what came to be called the "Total Access Plan." It was the subject of a two-week evidentiary hearing in March, 1982, which resulted in the court's rejection of that plan upon the finding that it was lacking in "concern, commitment and capacity." The Board then submitted the "Consensus Plan" which consisted of the October 30, 1981 student assignment plan with two magnet schools as educational enhancements which had been suggested in the Total Access Plan. The interim nature of the Consensus Plan is identified in the following language from the introduction to it:

## INTRODUCTION

In response to the order of the Federal District Court of March 15, 1982, and in accordance with the Denver Board of Education motion of March 18, 1982, a pupil assignment plan is being submitted for the achievement of a unitary, non-racial system of public education.

This Pupil Assignment Plan combines the Consensus Plan of October 1981 with certain educational enhancements of the Total Access Plan of December 1981. It reflects the determination of the Board of Education to provide a quality educational experience for all children which will:

- create as many walk-in schools as possible
- remove as many pupils as possible from required busing
- bring stability to pupil assignment areas
- continue the effort to realize and maintain a unitary school system
- remain sensitive to the changing needs of a diverse, urban pupil population
- be in compliance with the United States District Court Order.

The Pupil Assignment Plan includes the mandatory assignment of pupils, the closing of nine schools, and the implementation of the middle school program now in preparation.

The preparation of the Consensus Plan included extensive community involvement, intensive study by an Ad Hoc Committee of the Board of Education, and direct personal involvement of all members of the Board of Education in the final decision making process, resulting in a comprehensive plan for adjusting existing school attendance boundaries. Two educational enhancements of the Pupil Assignment Plan are the Fundamental School to be conducted at Knight Elementary School and a self-supporting extended day school at Gilpin Elementary School. The ethnic ratio in each of these schools shall reflect the pupil population in the District in keeping with Court determined pupil ethnic assignment ratios. Knight Fundamental School will be open to all pupils in the District; the Gilpin School population will include pupils in the home attendance area and pupils from the entire District who are enrolled in the extended day program.

Upon Court approval of the Pupil Assignment Plan, staff will begin preparations for further educational enhancements for possible addition each year as an ongoing feature of District educational planning policy.

In addition, the Plan includes three significant Denver Public Schools initiatives, components of the Total Access Plan, which are designed to enhance educational opportunity:

- District and School Accountability Councils
- Guidelines for Pupil Placement
- Standards for School Effectiveness.

The presently authorized District and School Accountability Councils are used in the Plan as monitors of educational quality and equity, achievement of goals, and equitable disciplinary policies and procedures.

Guidelines for Inschool Pupil Placement were approved by the Board of Education in February 1982. These guidelines ensure that pupils will participate in experiences that are relevant to the cultural, ethnic, and racial diversity of the school and that grouping is based on a fair assessment of pupils' skills, interests, needs, and aptitudes.

The "Standards for School Effectiveness" is based on extensive research which has identified characteristics of effective schools. The "Standards" includes specific instruments for assessing these characteristics and means for maintaining effective practices and improving areas of weakness in each school.

Finally, the Board of Education submits for the Court's approval plans for building a needed elementary school facility in Montbello and a replacement facility in the Columbian area.

The basic instructional programs and educational enhancements presently in place in the Denver Public Schools also are described and included in this report.

In approving the Consensus Plan, this court emphasized that the approval was for an interim solution, recognizing that the plaintiffs/intervenors had made objections

to portions of it with an evidentiary showing that it would probably produce resegregative effects in some elementary schools. The court's reservations were expressed in the following language:

> In this case, I am now accepting the modified consensus plan for the single school year of 1982–83. I do so with considerable reservation because I am not convinced that the incumbent school Board has shown a commitment to the creation of a unitary school system which will have adequate capacity for the delivery of educational services without racial disadvantages.
>
> The consensus plan is an expedient which will accommodate the educational policy decision to move to middle schools and which will attenuate the divisive effects from the factionalism found in the present board of education. The positive element in this plan is that it reflects a consensus of the views of the board members. Acceptance of this plan for a single school year is not to be construed as an abdication of this court's authority and responsibility to compel compliance with the desegregation mandate.

*Keyes v. School Dist. No. 1, Denver, Colo.,* 540 F.Supp. 399, 403 (D.Colo.1982).

Along with that reservation, the court attempted to set some direction for the anticipated future planning by adopting the Ad Hoc Committee's definition of a unitary school system as follows:

> A unitary school system is one in which all of the students have equal access to the opportunity for education, with the publicly provided educational resources distributed equitably, and with the expectation that all students can acquire a community defined level of knowledge and skills consistent with their individual efforts and abilities. It provides a chance to develop fully each individual's potentials, without being restricted by an identification with any racial or ethnic groups.

*Id.* at 403–404.

This court also expressed a favorable view of the Ad Hoc Committee's guidelines

as criteria for identifying a unitary system in operation. Believing that progress toward the defined goal of unity required both effective monitoring and expert advice from appropriate academic disciplines, and after consultation with counsel for all parties, the court appointed the Compliance Assistance Panel, composed of three outstanding scholars who had appeared at various times as expert witnesses in this case.

The court's charge to that committee was to perform the following duties:

1. To meet with the Board of Education, any committee or administrative staff designated by the Board, and with counsel for the parties herein, for the purpose of preparing a timetable for the preparation and submission of a pupil assignment plan for the school year 1983–84.

2. To meet with the Board of Education, any committee or administrative staff designated by the Board, and with counsel for the parties herein, for the purpose of preparing appropriate guidelines for pupil assignment plans for subsequent years, including long-range planning.

3. To prepare and submit a set of criteria for the identification of a Unitary School System, using the Unitary School System Plan Final Report of the Ad Hoc Committee, presented June 5, 1981 (Defendant's Exhibit D–2) as an initial working document.

4. To develop a plan to review, analyze and report on the present affirmative action plan for faculty and staff, including in-service training, and contigency plans for recruitment and reduction of faculty and staff, according to needs, on a non-discriminatory basis, consistent with existing collective bargaining contracts.

5. To prepare a plan for review, analysis and reporting on any racially discriminatory effects from present practices in the measurement of educational achievement and student discipline.

6. To develop recommendations for establishing criteria for school closings and new construction.

7. To develop a recommendation for constraints to be considered in proposals for the establishment of additional magnet schools and any other proposals for enhancement of educational opportunities to ensure racial and ethnic equality in the availability of such services.

8. To develop recommendations for interaction with local, state and national governmental agencies whose decisions concerning housing, zoning, transportation and other governmental services may influence and affect school policies and programs, including the demographics of the district.

9. To develop a plan for the collection and collation of the views of identifiable organizations and groups concerned with equal educational opportunity.

10. To develop a plan for the assessment of the effectiveness of the monitoring and self-evaluation methods adopted by the School District.

It now appears from the testimony of Board members and administrative staff at the hearing on the subject motion that the court's appointees were seen as interlopers, and that this court was considered to be intervening in the operation of the school system far beyond any appropriate role. It is also now apparent that contrary to what was being represented to the court and to the community, the Board had adopted a secret agenda to hire a mathematician experienced in the display of statistical data in desegregation cases and a new lawyer, who had successfully represented another school district in *Pasadena City Board of Education v. Spangler*, 427 U.S. 424, 96 S.Ct. 2697, 49 L.Ed.2d 599 (1976), to develop the display presented with the effort to terminate this litigation. In consequence, the spirit of cooperation which had seemed to exist among counsel in this case was replaced by the old adversarial confrontation necessary for the proper presentation of the very different views which are now before this court.

In approving submission of the subject motion, the Board of Education altered its position in this litigation. All of the members of the Board adopting Resolution No. 2228 have testified to their individual intentions in taking that action. The common theme was the expression of a shared concern that continuation under court control stigmatizes the Denver school system with consequent adverse effects on the schools and the community as a whole. There is a perception that families have fled to private schools and to the suburbs to avoid forced busing, and a belief that this court's involvement creates a climate of coercion which prevents the development of positive and innovative educational programs.

This court does not discount the reality of the declining enrollment and the possibility of a causal relationship with court-ordered reassignments as suggested by some of the data in the evidence. It is also unquestioned that people who devote their time and energy to the extremely difficult task of serving on the Board of Education, without remuneration, are citizens with outstanding qualities of commitment to the public welfare and dedication to the best interests of future generations. They are chosen from the community to express and implement the will of the electorate, and it must be assumed that the subject motion was the sense of the majority of the voters in District No. 1. Yet, School Board members, as all other elected representatives of the people, must also hear and heed the commands of the Constitution which often conflict with majoritarian opinion. The courts have the duty to articulate and apply those constitutional limitations in particular circumstances.

## HAS A UNITARY SCHOOL SYSTEM BEEN ESTABLISHED IN DENVER?

In answering affirmatively, the defendants set forth a simple syllogism. Major premise: The 1974 Decree, as modified in 1976, called for a complete and adequate remedy for the segregative effects of Denver's dual system. Minor premise: The District has complied with all of the re-

quirements of the Decree since 1976. Conclusion: Denver has achieved desegregation and is now a unitary district.

■ As already discussed, the Tenth Circuit Court of Appeals determined the 1974 Final Decree to be inadequate. Therefore, the question to be asked with respect to the major premise in this argument is whether the 1976 modifications, coupled with the remaining portions of the 1974 Decree, constituted a sufficient plan to desegregate the entire Denver Public School System "root and branch." [4] As counsel for the District recognize, an adequate desegregation plan must include more than the assignment of pupils to avoid the racial identification of schools. It must also address the policies and practices with respect to faculty, staff, transportation, extracurricular activities and facilities. *Green v. County School Board,* 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968). Additionally, an adequate remedy must ensure against any future use of school construction and abandonment to serve, perpetuate, or re-establish a dual system. *Swann v. Charlotte-Mecklenburg Board of Education,* 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971).

As noted above, the 1976 Order was simply the approval of a stipulated plan submitted in a spirit of compromise and, by Resolution No. 1897, the Board indicated clearly the expectation that changes would be required in future years. That was the reason the Board requested a three-year moratorium. Nothing in the 1974 Order, and nothing in the 1976 agreed plan, established any mechanism to avoid future segregation in making school construction and school abandonment decisions. At this point, it is well to return to the exact language of the Supreme Court in *Swann:*

> In devising remedies where legally imposed segregation has been established, it is the responsibility of local authorities and district courts to see to it that future school construction and abandonment are

not used and do not serve to perpetuate or re-establish the dual system. *When necessary, district courts should retain jurisdiction to assure that these responsibilities are carried out.*

402 U.S. at 21, 91 S.Ct. at 1279 (emphasis added).

■ Plainly, the court and all parties were aware that the remedy phase of this case did not end with the signing off on the 1976 agreed modifications and intended the retention of jurisdiction for the indefinite future. The adequacy of any desegregation plan is, of course, measured not by its intentions but by its effectiveness. *See Dayton Board of Education v. Brinkman,* 443 U.S. 526, 538, 99 S.Ct. 2971, 61 L.Ed.2d 720 (1979) (*Dayton II*). Thus, determination of the adequacy of the 1974 plan, as modified in 1976, is directly related not only to the degree of compliance by the defendant District in the intervening years, but also to whether the implementation of the plan achieved the results intended. Therefore, the major premise and minor premise may be addressed together in reviewing the subsequent events.

What then was accomplished between 1976 and 1980? Mitchell, Gilpin and Fairview Schools fell below the then applicable guideline of a minimum 34% Anglo enrollment in the fall of 1976. In 1979, Mitchell had a 26.8% Anglo enrollment, and Gilpin had fallen to 19.6%. The need to close some school facilities became apparent as early as the 1976–1977 school year. This court's Order set May 1, 1979 as the date for the Board to file a comprehensive student assignment plan, and June 1, 1979 as the reporting date on the status of other aspects of the plan, including affirmative action and in-service training. As earlier noted, a plan was submitted by Resolution No. 2060, and the plaintiffs/intervenors filed objections with alternative proposals. In the absence of further Board action to meet those objections and to consider the alternative proposals, this court was com-

---

**4.** The "root and branch" requirement was established in *Green v. County School Board,* 391 U.S. 430, 438, 88 S.Ct. 1689, 1694, 20 L.Ed.2d 716 (1968), and was specifically applied to Denver in *Keyes,* 413 U.S. at 213, 93 S.Ct. at 2699.

pelled to make the reassignment of pupils from the closed schools and to attempt to alter the racial isolation of Fairview. The court did not act to remedy the racial identification of Gilpin and Mitchell Schools, and it was partially for this reason that the court expressly recognized that the 1979 order was interim action required to meet an "existent emergency." *Keyes*, 474 F.Supp. at 1271. The court also, as earlier noted, made an explicit finding of fact and conclusion of law that the School District had not achieved unitary status, and there was no appeal from that determination.

The adoption of the Consensus Plan was explicitly identified as another interim expedient, made necessary by the Board's abrupt change of position in submitting the Total Access Plan, implicitly repudiating the work of its own Ad Hoc Committee. *Keyes*, 540 F.Supp. at 404. During the 1982 hearings, the plaintiffs addressed very specific objections to features of the Consensus Plan and predicted resegregative effects from its implementation. It is important to recognize that the "consensus" of the "Consensus Plan" referred to a 6–1 consensus of the School Board members, and did not involve any agreement by the plaintiffs or the intervenors. It is also clear that the basis for the formation of the Board consensus was an effort to reduce "forced busing" by attempting to expand walk-in attendance areas. The proposal was premised on a hope that there would be a discernible movement toward natural integration of these attendance zones by changes in housing patterns.

The evidence now before the court shows that the plaintiffs' objections and the court's concerns about the Consensus Plan were well founded. Barrett and Harrington have become racially identifiable schools, with their respective Anglo populations falling from 43.3% and 25.3% in 1981 to 18% and 15% in 1983. Mitchell fell from 22.5% to 12% Anglo. The plaintiffs/intervenors argue that the resegregation of these schools as a result of the adoption of the Consensus Plan establishes proof of official segregative action which justifies remedial action by this court. The defend-

ants counter with the contention that the loss of Anglo enrollment at these schools is additional evidence of the phenomenon of white flight, and that the existence of three racially identifiable elementary schools does not indicate a return to a dual system. Indeed, a basic dispute between the parties in this case is the manner in which statistics should be used to measure desegregation, as will be discussed later in this opinion.

It is not necessary to deal with the contention that the Consensus Plan showed segregative intent. The conclusion of this court is that it has had and continues to have jurisdiction in this case, and no new intentional acts are required to justify the exercise of that jurisdiction.

Over the last nine years, the Denver Public School System has become smaller, both in numbers of students and schools. In 1976–77, the school system contained 61,680 students in 119 schools. In 1983–84, the Denver Public School system contained 51,159 students in 107 schools. The ethnicity of the pupil population has also changed. In 1976–77, the District was 49.33% Anglo, 28.23% Hispano and 20.30% Black. In 1983–84, the District was 39.18% Anglo, 33.33% Hispano and 22.72% Black.

There are now three levels of schools in the system, elementary schools, middle schools (grades 7–8), and high schools (grades 9–12). In 1983–84, 80 schools, or nearly 75% of the schools in the school system, were elementary schools. The number of schools and their sizes are significantly different at the three levels. Maintenance of stable ethnic distributions of students is more difficult in the elementary schools than in either the middle or senior high schools, because the same absolute change in the number of students in an elementary school has a greater relative effect on ethnic percentages in the school. Typically, elementary school attendance zones are smaller and more sensitive to local demographic changes. The larger the school, the more elastic is its response to small changes in school populations.

The defendants have presented a vast array of statistical data and expert opinion to support the claim that since 1976, the City and County of Denver and the Denver Public School System have undergone demographic changes which have had a "striking" effect on student attendance patterns. The District urges that "extensive movement" of population within Denver and "a steady and large decline in enrollment, almost all of which represented a loss of Anglo students" are reasons for the development of racial imbalance in certain schools. In making that argument, the defendants place heavy emphasis on an exhibit derived from a question in the 1980 long-form census questionnaire (which asked where people lived five years ago) to suggest that there was a large migration of Anglo families with school-age children from Denver out to the suburbs between 1975 and 1980, and that there was no significant converse movement.

This presentation is flawed by the omission of information about persons who lived in Denver in 1975 and moved away from the entire metropolitan area. The exhibit titled "Patterns of Demographic Mobility and Family Income Within Denver SMSA" presents data in three groups. Group A is titled "Denver Residents," group B is "Suburban Residents," and group C is "In-Migrants." The universe from which the percentages are computed for groups A and B is not complete. Group A only makes sense as a description of what has happened to the set of people who were Denver residents in 1975. It includes those 1980 Denver residents who answered that they did not move or moved only within Denver. It also includes those residents in the Denver suburbs in 1980 who responded that they lived in Denver 5 years earlier. However, Group A does not include the persons who did live in Denver in 1975 but who moved away from the Denver SMSA (Standard Metropolitan Statistical Area) before 1980. The calculations for Group B contain the same omission. Without knowing how many households moved away from the Denver metropolitan area since 1975, accurate percentages cannot be computed, and the data are not very helpful in the present analysis. This court is not persuaded that demographic change is the reason for the development of racial imbalance in the schools.

## HAS DISTRICT NO. 1 COMPLIED WITH THE COURT ORDERS?

### Student Assignments

The District did implement the pupil assignment plan accepted by the 1976 Decree in the school year 1976–1977. Transportation was provided and, on the whole, pupils were required to attend the designated schools. Accordingly, during that particular school year, the Denver school system can be considered desegregated with respect to pupil assignments. That, of course, is but one of the elements in a unitary system.

### Faculty Assignments

The plaintiffs/intervenors contend that there has never been compliance with the faculty assignment provision of the 1974 Decree. On this point, the evidentiary hearing on the subject motion presented a question of which this court was not previously aware. Paragraph 19A of the 1974 Decree imposed the following requirement with respect to faculty assignments:

> Effective not later than the beginning of the 1974–75 school year, the principals, teachers, teacher-aides and other staff who work directly with children at a school shall be so assigned that in no case will the racial or ethnic composition of a staff indicate that a school is intended for minority students or Anglo students. The District shall assign the staff described above so that the ratio of minority to Anglo teachers and other staff in each school shall be not less than 50% of the ratio of such teachers and other staff to the teachers and other staff, respectively, in the entire school system. Because of the present small number of Chicano teachers in the system, complete achievement of the required ratios as to Chicano teachers is not required immediately, but should be achieved as soon as possible.

The parties have differing interpretations of that language. The District interprets paragraph 19A to require that the ratio of Black teachers to the total of Black, Hispano and Anglo teachers in each school be compared with the district-wide ratio of Black teachers to the district-wide total of Black, Hispano and Anglo teachers, and that similar but separate ratios also should be computed for Hispano teachers.

Further, the District has determined that in applying these ratios for a particular school, if the required number of Black or Hispano teachers is some integer number plus a fraction which is less than one-half, then a school is in compliance with the decree if its faculty includes only the whole number of such teachers. Any fractional part less than one-half has been ignored. For example, in 1981–82, the district ratio of Black classroom teachers to the total of Black, Hispano and Anglo classroom teachers was 0.1350, and one-half of this number is 0.0675. Carson Elementary School had 25 Black, Hispano and Anglo teachers. To have a Black faculty percentage greater than 50% of the district-wide ratio, Carson would require $0.0675 \times 25$, or 1.69 Black teachers. In 1981–82, Carson had 3 Black teachers and satisfied paragraph 19A as interpreted by the District. However, in 1981–82, Johnson elementary school had 22 Black, Hispano and Anglo teachers and would need $0.0675 \times 22$, or 1.485 Black teachers to satisfy the test. Johnson had 1 Black teacher. Because the remaining fraction was less than 0.5, the District determined the school to be in compliance.

Another important aspect of the District's approach is the use of the prior year's district-wide teachers' ratios to determine the degree of compliance for a current year because it is the District's practice to assign faculty members in the spring for the following fall. A possible result is that the district-wide ratios used are less than the actual ratios of minority to total teachers in the district for the following year if, in fact, the proportion of minority teachers increases from year to year, as a result of the affirmative action hiring program. That has, indeed, occurred. The District defends this as the proper way to determine compliance because it is the only basis on which faculty assignments for a new school year can be made. There is no explanation for that conclusion.

The District apparently has adopted the interpretation which requires the fewest minority teachers in schools which previously had a predominantly Anglo faculty. In 1983–84, there were 13 schools with one Black teacher and 27 schools with one or no Hispano teachers. After the large scale administrative reassignment of teachers in 1974, the minimum ratios have been maintained principally through assignment of new teachers and voluntary teacher transfers.

The plaintiffs contend that the correct interpretation of the requirement is to use a ratio of all minority teachers to Anglo teachers. Additionally, they urge that fractions of less than one-half should not be disregarded and current year data should be used. With this interpretation, the plaintiffs determined that for 1983–84, there were these deficits:

| Elementary | | Middle School | | High School | |
|---|---|---|---|---|---|
| School | Deficit | School | Deficit | School | Deficit |
| Force | 1 | Henry | 2 | Jefferson | 4 |
| Newlon | 1 | Baker | 1 | Kennedy | 3 |
| Remington | 1 | | | Lincoln | 3 |
| Cheltenham | 1 | | | West | 2 |
| Sabin | 1 | | | | |
| Westwood | 1 | | | | |
| Johnson | 1 | | | | |

In this particular dispute, the parties have overlooked the language of the Tenth Circuit Court of Appeals. Whatever ambiguity may exist in paragraph 19A of the district court's 1974 Decree, the appellate court made it clear that it was affirming an order which it construed as requiring that the District "assign its personnel so that, in each school, the ratio of minority teachers and staff to Anglo teachers and staff shall not be less than 50% of the ratio of minority to Anglo staff in the entire system." *Keyes*, 521 F.2d at 484. There is no ambiguity in that language, and it is the law of the case, binding on this court as well as the parties. Accordingly, the District's view is incorrect and the District has been out of compliance with this requirement during all of the intervening school years. Additionally, "rounding down" instead of "rounding up" of fractions is not in compliance with the tenor of the Decree which was to remedy, as much as possible, the prior practice of assigning Black teachers to Black schools as "role models."

The April 17, 1974 Order did not expressly require the District to reduce minority to Anglo teacher ratios in each school below a specified maximum; however, paragraph 19A provides that "principals, teachers, teacher-aides and other staff who work directly with children at a school shall be so assigned that in no case will the racial or ethnic composition of a staff indicate that a school is intended for minority students or Anglo students."

The evidence presented at the hearing indicates that the District has not had any expressed policy of limiting the concentration of minority teachers in the minority schools using specific guidelines such as are set out in the April, 1974 Order for schools with a high concentration of Anglo teachers. On cross-examination Dr. Stetzler, executive director of personnel for the school system from 1974 to 1982, testified that the District never did establish any guidelinesfor determining when a school had too many minority teachers, stating that it was "a matter of judgment."

Dr. Welch, the District's expert witness on teacher assignment and affirmative action at the hearing, testified that he did not examine, and by implication was not asked to examine, the extent to which the schools with historic concentrations of minority teachers, or formerly segregated minority schools, still had minority teachers disproportionately represented or over-represented.

As support for its assertion that the District is unitary with regard to the assignment of school faculty, the defendants argue, somewhat disingenuously, that in 1976 there were only 8 schools whose Black faculty exceeded 20% and only one school whose Hispano faculty exceeded 20%. It is not clear why the District chose 20% as a comparison figure. In 1976–77, the percentage of Black teachers in the district was 10.67% and the percentage of Hispano teachers was 6.17%, so that the 20% figure for minority teachers in a particular school is significantly above the 1976 minority averages. However, using the same 20% figure for later years, the District fails to point out that the number of schools at which the Black faculty equalled or exceeded 20% steadily increased so that in 1983–84 there were 33 schools in which the Black faculty equalled or exceeded 20% and 11 schools in which the Hispano faculty equalled or exceeded 20%.

In 1976–77, there were no schools whose Black or Hispano faculty was greater than or equal to 30% of the total faculty. In 1983–84 there were 8 schools whose Black faculty met or exceeded 30% and 5 schools whose Hispano faculty exceeded 30%. It is true that during this period the percentage of minority teachers in the district increased. In 1983–84 the district-wide percentage of Black teachers was still only 13.79%, and the Hispano percentage was 9.67%. Therefore, the 20% figure used by the District was nearly 1.5 times the district average for Black teachers, and twice the District average for Hispano teachers.

The schools with a high percentage of minority teachers are, in large part, the same Park Hill and core city schools identi-

fied by the Supreme Court in *Keyes*, 413 U.S. at 192–193 nn. 3, 4, 93 S.Ct. at 2689 nn. 3, 4. Seventy-five percent of the schools listed below are north of Ninth Avenue. Comparing the location of the listed school with its percentage of minority teachers and the minority residential patterns in Denver, reflected in the census data maps submitted by the District, it appears that the concentration of minority teachers in the schools is correlated to minority residential patterns.[5]

Schools with not less than 20% Black faculty in 1983–84 (% Black faculty in district = 13.79%)

| | | |
|---|---|---|
| Amesse | 36.0% | – |
| Ford | 36.0% | – |
| Teller | 35.7% | |
| Stedman | 35.0% | * |
| McGlone | 32.0% | – |
| Ebert | 30.8% | # |
| Oakland | 30.8% | – |
| Wyman | 30.0% | # |
| Cole | 29.2% | # |
| Montclair | 28.6% | |
| Barrett | 27.3% | * |
| Smith | 26.9% | * |
| Whiteman | 26.3% | |
| Park Hill | 25.9% | * |
| Smiley | 25.0% | * |
| Swansea | 23.8% | # |
| Palmer | 23.1% | |
| Montbello | 22.7% | – |
| Columbine | 22.7% | # |
| Hallett | 22.7% | * |
| Harrington | 22.7% | # |
| Holm | 22.2% | |
| Gilpin | 22.2% | # |
| Carson | 22.2% | |
| Mitchell | 21.4% | # |
| Grant | 21.2% | |
| McMeen | 21.1% | |
| Cowell | 21.1% | |
| Asbury | 20.0% | |
| Philips | 20.0% | * |
| Samuels | 20.0% | |
| Manual | 20.0% | # |

Schools with not less than 20% Hispano faculty in 1983–84 (% Hispano faculty in district = 9.67%)

| | | |
|---|---|---|
| Bryant-Webster | 40.7% | # |
| Fairmont | 34.6% | # |
| Crofton | 33.3% | # |
| Gilpin | 33.3% | # |
| Del Pueblo | 33.1% | |
| Greenlee | 29.4% | # |
| Columbian | 25.0% | |
| Fairview | 22.2% | # |
| Smedley | 21.7% | # |
| Edison | 21.4% | |
| Valdez | 20.6% | |

* Park Hill schools
# Core city schools
– New schools built in Montbello area since 1973.

Comparing the same variables for the schools with an assigned allocation of Anglo faculty greater than 88% indicates that many of these schools, marked below with a "+", are located in extreme south and southwest Denver.

| | | |
|---|---|---|
| Newlon | 89.74% | |
| Force | 89.74 | |
| Remington | 89.47% | |
| T.Jefferson | 89.25% | + |
| Cheltenham | 88.89% | |
| Sabin | 88.89% | + |
| Kennedy | 88.75% | + |
| Henry | 88.37% | + |

**5.** It is to be remembered that there now are bilingual programs in effect at some schools as a consequence of this court's orders entered in that phase of this litigation. The interaction of the language proficiency order and the desegregation requirements is discussed infra.

Using an upper limit of 50% above the district average for Black and Hispano teachers, in 1983–84 there were 28 schools which exceeded that limit for Black teachers, and 21 schools which exceeded that limit for Hispano teachers.

Dr. Charles Willie, an expert witness called by the plaintiffs, examined the current distribution of the District's teachers and determined that the Black teachers within the Denver School System were not randomly distributed in a way that would be similar to their proportion in the total district. Using a deployment criterion of ± ⅓ of the District average for Black and Hispano teachers, Dr. Willie testified that in the 1983–84 school year there were approximately 35 schools in Denver in which the proportion of Black teachers was greater than ⅓ of the district-wide percentage. There were approximately 33 schools, or 63% of the schools in the district, in which the proportion of Black teachers was smaller than ⅓ of the district-wide percentage. Similar results were obtained for Hispano teachers. Dr. Willie opined that the Denver School System needs clearer and more specific guidelines because its good faith efforts have not enabled it to deploy its teachers to avoid racial identification of schools.

Dr. Willie also testified that while he was a member of the Compliance Assistance Panel, he recommended several teacher deployment guidelines which the District could use. The District's initial response was that the court never ruled on the guidelines for the hiring, retention and deployment of teachers, and because the court had never ruled on that issue, the School System was not inclined to institute such requirements voluntarily. From the totality of the evidence, this court finds that the District has tended to interpret the Decree's mandate for minimum percentages of minority teachers as the maximum for schools with large Anglo enrollments and has failed to place any maximum minority percentages for the schools with large minority pupil populations. The conclusion is that there is a sufficient residue of segregation in faculty assignments to deny a finding that the District has been desegregated in that respect.

*Hardship Transfers*

Both in the 1982 and the 1984 evidentiary hearings, the plaintiffs/intervenors have asserted that the "hardship transfer" policy has functioned as the equivalent of a "voluntary transfer" program resulting in resegregative effects on pupil assignments. The evidence on this point is somewhat limited by the recordkeeping practices of the District. While the application for a hardship transfer, made by the parents and processed through the school of assignment, requests information concerning race and the reason for the transfer, the effects of the transfer on the transferor and transferee schools are not reflected in the records kept in the school administration office where this process is completed. The principal reasons for hardship transfers are babysitting in the elementary schools and work opportunities for students in high school. Because a transfer will be given to the school nearest the residence of the babysitter, and to a high school closer to the work place, there is an obvious opportunity for manipulation by the transferors. That opportunity has provided the basis for the suspicions asserted by the plaintiffs who have pointed to some impact on schools such as Mitchell.

In response to interrogatories, the District provided data on the hardship transfers approved in the 1983–84 school year by race or ethnicity into and out of each school. With this information, the plaintiffs' expert witness computed the net effect of hardship transfers on the Anglo percentage in each school. The response to plaintiffs' interrogatories listed each school with a count of the transfers into the school by race and the name of the transferor school. From this information, the witness calculated the total transfers into and out of a particular school by ethnicity and combined these figures to obtain a net change. The net effect on the percentage of Anglo students was computed by comparing the percentage of Anglos in a partic-

ular school without any transfers to the percent Anglo in the school with hardship transfers. The net Anglo change does reflect the overall effect on a particular school but does not indicate whether the change is due primarily to Anglo student transfers in or minority student transfers out.

The final results of this analysis show 17 elementary schools with an Anglo population which either increased or decreased by more than 1.5 percentage points due to hardship transfers, and 4 elementary schools with an Anglo percentage which changed by more than 3 points. There are no middle or senior high schools with a net Anglo change greater than 1.5 points. While the defendants argue that in the context of the entire school system these changes are insignificant, a look at the particular schools involved is instructive and shows small scale effects which can be considered significant in light of the history of this case.

The four elementary schools with greater than a 3 point change in 1983–84 are Barrett, –4.02, Crofton, –5.48, Mitchell, –3.38, and Bromwell, +4.72. In 1983–84, all of these schools were outside of the accepted range for Anglo population. Barrett and Crofton would have been within the range without the hardship transfers. Since 1979–80, the percentage of Anglo students at Bromwell, which is not a paired school, has been steadily increasing and has varied between +7.3 and +13.5 percentage points above the range. Since 1983–84, Mitchell has been below the range by at least 6 points. Barrett, Crofton and Mitchell are formerly racially identifiable schools in the Park Hill or core city area. (In 1968, Barrett was 0.3% Anglo; Crofton was 5.0% Anglo; Mitchell was 0.8% Anglo; and Bromwell, which is located in central Denver, was 92.0% Anglo).

The middle and senior high schools with the greatest changes were Cole with a net Anglo decrease of 1.36%, and Manual with a net Anglo decrease of 1.35%. As a result of hardship transfers, there was a net increase of 22 Black and Hispano students at

Manual. Cole and Manual were the only junior and senior high schools in 1968 which were over 95% Black. From 1974 to 1982, the percentage Anglo in both Cole and Manual was between 50% and 60%. In 1982, the percentage Anglo in Cole decreased to 35% and dropped to 34% in 1983–84. The percentage Anglo at Manual remains at approximately 50%.

In commenting on the plaintiffs' transfer analysis, the defendants' witness, Dr. Ross, testified that in 1983–84, more minority than Anglo students received hardship or babysitting transfers, which indicates that the District is not permitting such transfers to be used to avoid the desegregation plan. In 1983–84, there were a total of 1674 transfers granted, including 679 Anglo students, 515 Hispano students and 400 Black students. There also were a few transfers for Asian and Native American students. Expressed as percentages, there were 40.56% Anglo, 30.76% Hispano and 23.89% Black student transfers. These percentages are nearly equal to the percentages of the total student population for these groups in 1983–84, which were 39.18% Anglo, 33.33% Hispano and 22.72% Black. No conclusion can be drawn from the aggregate distribution of student transfers among Anglos, Blacks and Hispanos.

The District also argues that the plaintiffs' data do not show whether the transfers which resulted in Anglo loss in the identified schools had a positive effect on the ethnic composition of the sending school. A look at the individual data for Bromwell shows that the students who transferred into Bromwell were almost exclusively Anglo students. Thirty-one of the 34 transfers into Bromwell were Anglo students, and 13 of the 31 students transferred from the core city and Park Hill schools—Crofton, Fairmont, Harrington, Smedley, Smith, Stedman and Whittier— identified by the Supreme Court in *Keyes.*

Bromwell may be atypical. There is no other school with such a large net increase in Anglo population due to transfers. Yet the fact that the schools with the largest net changes are the schools which have

historically been the racially identifiable schools is some evidence that for those schools the hardship transfer may have been used to avoid the desegregation plan.

The District has done the minimum required in keeping records and maintaining the policy that it would refuse a transfer if the express reason given was "race." The District has failed to monitor the system-wide effect of the transfers, leaving the decision to the principal of the receiving school. In fact, prior to the 1982 hearing, no record of ethnicity was kept in the central card filing system. The plaintiffs' analysis of 1983–84 transfer data appears to be the first such system-wide analysis, and it does reveal that the effects of transfers in certain schools are significant and are contributing to the racial identification of those schools. In addition, the schools affected are some of the schools initially at issue in this lawsuit.

While the resulting finding is that the plaintiffs' data will not support the argument that the District has maintained an "open enrollment" policy through hardship transfers, the evidence shows a lack of concern about the possibility of misuse and a lack of monitoring of the effects of the policy.

There has been no challenge to the manner in which the District has applied the facilities and physical resources, and there is no contention that there has been any racial disadvantage operating in the extracurricular activities in the district.

### THE FUTURE

The District seeks an order that not only would declare the school system unitary, but would vacate the permanent injunction entered in this action and end this court's jurisdiction over the matter. The law in the Tenth Circuit is that a district court must retain jurisdiction in these circumstances until it is convinced that there is no reasonable expectation that constitutional violations will recur.

We believe that the court, in exercising continuing jurisdiction to achieve structural reform, cannot terminate its jurisdiction until it has eliminated the constitutional violation "root and branch." *See Green v. County School Board,* 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968). The court must exercise supervisory power over the matter until it can say with assurance that the unconstitutional practices have been discontinued and that there is no reasonable expectation that unconstitutional practices will recur. *Battle v. Anderson,* 708 F.2d 1523, 1538 (10th Cir.1983), *cert. dismissed,* —— U.S. ——, 104 S.Ct. 1019, 79 L.Ed.2d 248 (1984) (footnote omitted). The opinion in *Battle* cited *Green* as precedent in holding that the district court had not abused its discretion in retaining jurisdiction over Oklahoma state prisons although the constitutional violations had been eliminated.

Accepting the defendants' argument that the modified 1974 Final Judgment and Decree was a complete and adequate remedy which the District has fully implemented, jurisdiction should continue because the record does not support a finding that there is adequate protection against resegregation. To the contrary, the court is compelled to conclude that resegregation is inevitable if the School Board follows state law.

Resolution No. 2228, modeled after the resolution in *Spangler,* reaffirms the commitment of the Board of Education to the operation of a unitary school system. Neither the resolution, nor the testimony of the individual members of the Board of Education, gives any indication of how that will be accomplished in the absence of continued "forced busing," so long as the neighborhood school concept is preferred and the neighborhoods are not integrated. But, as the plaintiffs have observed in their brief, the Constitution of the State of Colorado expressly prohibits the use of such busing in the following language of the "anti-busing" amendment, adopted in 1974:

No sectarian tenets or doctrines shall ever be taught in the public school, nor shall any distinction or classification of pupils be made on account of race or color, *nor shall any pupil be assigned*

*or transported to any public education-*
*al institution for the purpose of achiev-*
*ing racial balance.*

Colo. Const. Art. IX, § 8 (emphasis added).

That is the organic law of the State of Colorado, and it is directly in conflict with the pupil assignment plan now in effect in the Denver School system. If the court's jurisdiction is removed it must be presumed that the members of the Board of Education, under the oath required of them by state law, will obey this requirement of the state constitution, and dismantle the entire pupil assignment plan. To this argument, the District has made no response in the reply brief. This constitutional provision, standing alone, makes this case far different from the *Spangler* decision upon which the District so heavily relies. Putting the point simply and directly, it is the authority of this court, under the supremacy clause of the United States Constitution, that permits the operation of the Denver public schools under the existing plan which would otherwise be a clear violation of the Colorado Constitution and in the absence of that plan, the system would be dual.

Above and beyond this legal impediment to maintaining a unitary school system, there is nothing before the court to give any assurance that the Board of Education will not permit resegregation to occur as a result of benign neglect. The District has done nothing to establish any means for monitoring operations to assure the avoidance of racial disadvantage. There is no clear commitment to the use of the guidelines prepared by the Ad Hoc Committee and adopted by the Board. In this regard, the court has some concern about the defendants' response to the contentions made in the intervenors' brief. Essentially, that response is that these are matters which are outside of this litigation. Yet these concerns about the effects of discriminato-

ry attitudes on academic achievement, discipline and dropouts are the very core of the whole matter of segregative policy in education as a violation of the United States Constitution. It is true that there is nothing in the law which does or could require equality in the results of educational services. But, since the sociologists tell us that sanctioned discrimination has these adverse effects on the individuals within the affected groups, the existence of disparate results suggests the possibility that continued discriminatory practices are present. It was to address these matters that the court offered the services of the members of the Compliance Assistance Panel. There is cause for concern about commitment when the Board and administrative staff seem to have not only rejected, but scorned such an effort at assistance in a difficult task.

In the defendants' briefs, much is made of the argument that findings in this case are based on broad constitutional principles rather than narrow statutes. That is true in a technical legal sense. Yet, as the courts have considered cases under the civil rights acts, both those adopted shortly after the approval of the Fourteenth Amendment to the United States Constitution, and those of more recent vintage, it is increasingly apparent that Congress has sought to assist in making the principle of equal protection of the laws a more practical and workable doctrine by giving it more specific definition in such areas as employment, voting and participation in publicly funded programs. Thus there is an observable convergence of constitutional principle and statutory prohibition. It may well be that in future school desegregation litigation, the concepts of "disparate treatment" and "disparate impact," so well known in employment cases, will come to be the focus of attention.[6]

---

**6.** Disparate impact and disparate treatment are alternative theories for relief under Title VII, 42 U.S.C. §§ 2000e–2000e–17. "While proof of discriminatory motive is necessary under a disparate treatment theory, such proof is not required under a disparate impact theory. (Citation omitted) For the latter, it is enough that the

employment practices had a discriminatory *effect.*" (Emphasis in original). *Williams v. Colorado Springs, Colorado School District No. 11,* 641 F.2d 835, 839 (10th Cir.1981). *See also Segar v. Smith,* 738 F.2d 1249 (D.C.Cir.1984), *cert. denied,* —— U.S. ——, 105 S.Ct. 2357, 86 L.Ed.2d 258 (1985); *Gay v. Waiters' and Dairy*

It is paradoxical that the defendants' presentation to this court in support of the subject motion has placed such heavy emphasis on the use of statistical displays to demonstrate the establishment of a unitary system when the thrust of the *Spangler* decision is to decry the rigidity of defining desegregation according to any fixed racial ratio. Both in 1979 and in 1982, this court emphasized the importance of recognizing that establishing and maintaining a unitary school system requires more than meeting a statistically satisfactory pupil assignment plan. The expert testimony in this case concerning the use of racial balance and racial contact indices, and the differing conclusions reached by the experts called by the respective parties, demonstrate once again the facility with which numerical data may be manipulated and discriminatory policies may be masked.

The plaintiffs/intervenors have strongly suggested that the Board of Education acted in bad faith in adopting Resolution No. 2228 in December, 1983 after giving this court and the parties assurance in a hearing memorandum filed April 15, 1983, that the District was following the Ad Hoc Committee guidelines in planning for pupil assignments for 1984 and subsequent years. The plaintiffs also cite the testimony of School Board members from the trial that after the May, 1983 School Board election, Board members determined that there would be no changes in the plan.

The issue of good or bad faith of those Board members is irrelevant. As the history of this case has shown, the philosophical and political views of the elected Board will vary as is to be expected in representative government. Indeed, remembering that this case began when a Board resolution was repealed by a succeeding Board, little reliance can be placed upon Resolution No. 2228, or any other resolution, as directing future boards. What must be accomplished in constructing the final and ultimate permanent injunction in this case is the creation of means and mechanisms to prevent any future policy of discrimination,

whether it results from intentional governmental action or simply in consequence of a policy of disregard or permissive passivity.

The District has made a very expansive interpretation of the Supreme Court's *Spangler* opinion. The contention is that once a district has implemented an adequate desegregation plan and has maintained it for a reasonable period of time, it is entitled to be freed from further court jurisdiction even if resegregation occurs in the sense that schools become racially identifiable, if that result obtains from "demographic changes" and not because of official board action. The point is emphasized because under *Swann* there is no right to a particular degree of racial balance in each school. The fundamental error made by the district court in *Spangler* was the imposition of the rigid requirement that there be "no majority of any minority" in any school in perpetuity. The language of the majority opinion in *Spangler* can be read to support the defendants' contention. Yet, *Spangler* must be read in context with *Green* and *Swann*, as well as the language in the later cases of *Dayton II* and *Columbus Board of Education v. Penick*, 443 U.S. 449, 99 S.Ct. 2941, 61 L.Ed.2d 666 (1979). As the defendants' counsel have noted, the Supreme Court has not clearly articulated the time and manner within which a school desegregation case should be closed. Additionally, the Court has never defined "unitary." In this case, the School Board itself has been cooperative with the court in constructing a working definition of that concept by the adoption of the Ad Hoc Committee report and its guidelines, which this court approved in the 1982 opinion, and which the Board has again recognized in Resolution No. 2228.

What is of first importance in considering whether *Spangler* requires this court to terminate this case at this time is whether the Denver Public School System was unitary for the years 1976 through 1979. That, in turn, depends upon whether it is appropriate to parse the criteria in *Green*, and this court's own definition of unitari-

*Lunchmen's Union, Local No. 30,* 694 F.2d 531   (9th Cir.1982).

ness, to separate out pupil assignments from the other elements.

The measure of the adequacy of any desegregation plan is its effectiveness. It would be inappropriate to consider that a pupil assignment plan which simply establishes certain outside percentage limits for minority and Anglo students is, by itself, an effective elimination of the effects of prior segregative policies. That is why the *Green* case emphasized the other components of desegregation. In this case, it is this court's finding that there has not been an effective faculty assignment plan and, therefore, that omission by itself prevents the declaration that unitariness has been achieved.

Beyond that, it is this court's view that dicta in *Dayton II* and *Columbus* strongly suggest a more limited reading of the prohibition in *Spangler*. Thus, Justice White, in writing for the majority in *Columbus*, restated the proposition from *Swann* that school construction and abandonment practices cannot be used to perpetuate or reestablish a dual school system. In *Dayton II*, Justice White, again writing for the majority, said that pupil assignment plans are also not to be used to perpetuate or reestablish dual school systems.

It was the need to close four elementary schools and the change of educational policy to convert junior high schools to middle schools that brought the District back to this court in 1982. Those changes, of course, required a redetermination of the pupil assignment plan, and that was done in the Consensus Plan. The resegregative effects of the Consensus Plan are brushed aside by the District with the claim that this is another illustration of the white flight phenomenon after a court order reassigns attendance zones. This court is not persuaded that this proposition has been demonstrated by the evidence. As earlier noted, there appear to be flaws in the data which have been submitted on the subject of white flight. But, assuming white flight, the community response to a desegregation plan is an element in measuring its effectiveness. Indeed, that was the rea-

son that Judge Doyle appointed the Community Education Council as a monitoring committee to help the School Board obtain community acceptance. It is, therefore, no answer that any resegregation was not the *fault* of the School Board.

It is also an inappropriate response to contend that this resegregative effect cannot be considered because the 1982 opinion approved the Consensus Plan. The record is clear that the approval then given was with reservations and that the rejection of the plaintiffs' alternative proposals was a concession to the plea for "stability" and the avoidance of more disruption, recognizing that the District was then working on future planning.

While it is true that this has not been a case in which there has been an effort to develop "step at a time planning," it is also true that until the filing of the subject motion, the record in this case showed that all parties and the court were working with the premise that long-range planning was required, and that some final injunctive order would enter. As already noted, this court explicitly stated in its 1982 Opinion that the District had not become unitary.

It is clear from the testimony of the School Board members that the idea that desegregation had been achieved came from the work of a consultant with expertise in statistical analysis. The data developed in that study persuaded the Board that desegregation had occurred when measured by the racial balance and racial contact indices. The argument that desegregation is therefore demonstrated is just as facile and unrealistic as the rejected view of the district court in *Spangler*.

The testimony of the Board members also makes it clear that their motive in seeking a termination order is the sincere belief that the school system will benefit by removing a "stigma" that they believe has attached to it from the court's involvement. It is said that the necessity to come to the court for approval has inhibited creative planning and new educational development. While that may be the perception of many, there is no support for it in the record of

this court's involvement. In 1979, the Board was encouraged to pursue new initiatives. The Knight Fundamental School and Gilpin Extended Day School have received the court's approval and the community response has been enthusiastic as this record shows. There has never been any effort to suppress new and innovative developments, and this court has never sought to impose any educational policy. Indeed, in rejecting the request to choose between the Total Access Plan and the student assignment plan, the court again took pains to point out the differing roles and responsibilities of the Board of Education and this court.

It is disturbing to hear the views that stigma, punishment and trauma are involved in the processes of this court in this case. It is true that the case has been here for almost a decade, but it is also true that the effort has been to reverse the effects of segregative actions for a similar time. The notion that this court has sought to punish this Board of Education, this staff and the children now in the Denver School System, for past practices is simply wrong. What the court seeks, and what the Constitution demands, is assurance that minority people will not be disadvantaged in the opportunity for education. Thus, it is not punishment, but protection, that is the objective.

This court has carefully considered Resolution No. 2233. That resolution, adopted in April, 1984, after the filing of the subject motion, is a declaration of policies which the Board intends to follow upon termination of additional supervision. Among those policies is the statement that "there shall be no sudden alteration of the court-approved school assignment plan then in effect." It is this commitment which is directly contradictory to the prohibitions of the State Constitution and, as indicated earlier, the reply brief filed for the School Board did not even address this legal dilemma. The resolution also indicates the Board's continuing interest in neighborhood schools with the following paragraph:

The Board of Education, believing that the beneficial effects of integration are most fully realized in stably integrated neighborhood schools, shall preserve contiguous attendance zones for schools that are integrated and shall establish contiguous attendance zones whenever it appears that stable integration can be maintained in the schools serving such areas.

What is not indicated is whether the Board would proceed if the establishment of contiguous attendance zones to serve "stably integrated neighborhood schools" has a resegregative effect on other schools, as measured by pupil assignment ratios. Other aspects of Resolution No. 2233 were discussed in the testimony of Board members, and a fair summation of that testimony is that many matters would have to be studied before detailed implementation of all of the paragraphs of the Resolution could be achieved.

It is also interesting to consider the language of paragraph 2 of the Resolution:

This Board, the District, and officers and employees of the District shall not adopt any policy or program, institute any practice or procedure, or make or carry out any decision for the purpose of discriminating against any person by reason of race, color, or ethnic identification. \

The paragraph can be considered a statement of intention to avoid acts taken with discriminatory intent. It does not indicate that the Board, the District and its officers and employees will take any action to avoid any discriminatory impact of any policy or program. In the testimony of School Board members, there is, again, the complaint that the necessary planning and policy development suggested in the Resolution could not take place under court supervision. Again, the record in this case is to the contrary. In the 1979 Order, this court expressly encouraged innovative and creative thinking by the Board, and indicated a willingness to consider changes. Indeed, the 1982 Order did approve the change to middle schools even though that change had what the court hoped would be a tem-

porary resegregative effect on the elementary schools. Put simply, there is nothing in Resolution No. 2233 that the Board could not accomplish while still under the supervision of the court, and certainly nothing that could not be accomplished with a permanent injunctive order in effect.

The Board's brief adopts language from the Ninth Circuit in *Spangler v. Passadena City Board of Education*, 611 F.2d 1239 at 1240 (1979), to ask this court to address the basic question at this stage in this case: "If not now, and on this showing, when, and on what showing?" Because the court has answered the first part of that question in the negative, it is appropriate to give some guidance with respect to what this court believes the proper showing would be, although this discussion must be prefaced with the caveat that trial courts do not give advisory opinions. The adversary process must be permitted to function in the remaining stages of this litigation.

■ The Denver Board of Education has obviously been advised that the controlling law on terminating jurisdiction in a school desegregation case is that Ninth Circuit *Spangler* opinion which followed the Supreme Court's opinion. That case was decided by a three judge panel with two separate opinions and one judge concurring in both of them. Without question, both the Supreme Court opinion and the subsequent Ninth Circuit opinion make it clear that there can be no permanent injunction requiring a district to maintain any given degree of desegregation as measured by racial ratios in the schools. This court certainly agrees and has made the same statement in both the 1979 and 1982 opinions. Moreover, this court has no disagreement with the view that school desegregation cases like all other litigation must someday come to an end. In the 1982 opinion, this court urged the District to proceed with planning for the purpose of developing a final order which could bring this case to conclusion, and said the following:

The Denver Board of Education continued its positive response in May, 1980, when it adopted Resolution No. 2110, establishing an "Ad Hoc Committee" to design a new student assignment plan and to develop both a definition of and guidelines for constructing a unitary school system. During subsequent hearings, I encouraged that undertaking and said that it was consistent with an orderly approach to creating the conditions and climate for concluding this litigation. *Keyes*, 540 F.Supp. at 401.

This court has always recognized that the operations of a public school system, and the determination of the types and amount of educational services to be provided in it, are fundamentally matters of local self-governance. What the history of this case shows, however, is that each time the Denver Board of Education has been given the full opportunity to develop a pupil assignment plan which would avoid the racial identification of any schools, the Board has failed to perform that duty. The reason is self-evident. The total return to neighborhood schools throughout the system under the residential patterns which have existed and now exist would inevitably result in the resegregation of some schools, particularly at the elementary level. Therefore, it is not possible to avoid forced busing of part of the pupil population, and because overwhelming public opinion in Denver is against forced busing, elected officials have refused to take responsibility for ordering it. It is politically convenient to continue to contend that this contradiction of community will is the result of orders from a court which has misconstrued the law. The length of this opinion is warranted only for the purpose of once again making a full explanation of this court's reasoning. While the court has been patient in the continuing efforts to persuade the parties and the public with respect to the law, it has also repeatedly expressed concern that young people are being disadvantaged in the one opportunity given to them to obtain some level of educational achievement at public expense.

This court is now asked to rely on the good intentions expressed in Resolution

No. 2233. In the *Spangler* opinion, the Ninth Circuit judges correctly stated that when such resolutions are made as official acts, they are entitled to be viewed as a pledge made in good faith by the board members and the people they represent. The court does not doubt the good faith of members of the Board of Education and their intention to follow the law. The doubt is with respect to their understanding of the law. That doubt is fueled by the testimony of some Board members who said that since people are and should be free to live in any neighborhood they choose, segregation in neighborhood schools is acceptable.[7] That view is directly contrary to the *Brown* decision and would be a return to *Plessy v. Ferguson.*

Along with the assumption that the Board members will obey the law as they know it, the court must assume that these Board members will comply with the requirement of the Colorado Constitution that prohibits forced busing. How can this court assume that equal educational opportunity will be given to minority students in Denver, Colorado when the Board of Education officially proclaims a commitment to neighborhood schools while there are still segregated neighborhoods, and when the effective means for integration will be denied them under the organic law of the State of Colorado?

Resolution No. 2223 and the testimony of Board members have given vague allusions to increasing the use of magnet schools, and voluntary enrollment with special programs. It is that kind of speculation which caused the rejection of the Total Access Plan which was presented to the court with no provision for the kind of constraints required to protect against segregative effects. It may well be that through their creativity and industry, the Board and staff will develop plans and programs which can avoid segregative effects, meet the requirements of a unitary system under the court's definition, and avoid conflicts with the Colorado Constitution. Such a showing with appropriate injunctive orders to as-

sure continued effectiveness can certainly result in an order which could terminate this case. Nothing of the kind is in the present record.

The demonstrated uncertainty about the requirements of the law in this case is exactly the reason that a final injunctive order is required to end it. As all counsel in this case and as many lower courts have observed, the Supreme Court has never defined a unitary school system with any specificity. That is not the function of the Supreme Court of the United States. It exists to give general guidance on broad principles of constitutional law, and it is the work of the district courts, as trial courts, to apply those principles to the specific situation with specific orders. That was made clear in *Brown v. Board of Education,* 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083 (1955) (*Brown II*), and it is also clear from opinions in the Fifth Circuit Court of Appeals, a court which has been called upon to attempt to articulate the bases upon which school desegregation cases can be ended.

In testing whether the past has been eradicated so far as it remains in the power of school officials and courts to do so, we must keep in mind that each school district is unique. The constitutional mandate against racial discrimination is categoric, but the determination of remedies for its past violation turns on the conditions in a particular district. [Citation omitted.] In like fashion, the decision that public officials have satisfied their responsibility to eradicate segregation and its vestiges must be based on conditions in the district, the accomplishments to date, and the feasibility of further measures.

*Ross v. Houston Independent School Dist.,* 699 F.2d 218, 227 (5th Cir.1983).

The Fifth Circuit Court of Appeals requires a district court to retain jurisdiction over a school desegregation action for three years following the determination that the district is unitary to assure that

---

7. Testimony of Board member Paul Sandoval, Tr. 913–918.

the determination of unitary status is not premature. During that time, the district is required to file semiannual reports with the court. At the end of the three years, a hearing is held at which the plaintiffs may show cause why the case should not be dismissed. The district court then makes a final determination as to whether the district has achieved unitary status and may, at that time, dismiss the case. *Ross, supra; United States v. Texas,* 509 F.2d 192 (5th Cir.1975); *Youngblood v. Board of Public Instruction of Bay County,* 448 F.2d 770 (5th Cir.1971).

If the present Board members who have been in this court and who have some working knowledge of the issues in this case are confused about what is required of them, certainly it can be expected that future Board members will fail to understand how particular decisions concerning school construction, school closing, faculty assignments, transportation, facilities and extracurricular activities could have segregative effects because of the past policy in this particular district. Again, the court hopes that the recapitulation of the history of the case contained in this lengthy opinion will, itself, be of some value to decision makers in the future.

Contrary to the perception shown in the defendants' reply brief, the proposed permanent injunction is not criminal in its nature and need not, therefore, be as specific as may be indicated in some of the cases cited. The injunction is equitable and seeks to protect the constitutional rights of persons yet unborn. It need not require particular ratios of pupil assignments to various schools, percentages of faculty ethnicity in schools, specific affirmative action hiring plans, or even any commitment to transportation. It is not required that there be any firm commitment to neighborhood schools, magnet programs or other matters of educational policy. What will be required is the development of a structure within which these decisions will be made by local government which will provide assurance that those who make such decisions will obtain necessary information, give an adequate opportunity for minority views to be heard, and act with concern for and commitment to the constitutional principles of equal educational opportunity. In this respect, what the court is requiring is something not unlike the stop, look and listen requirements of environmental policy legislation.

This court has implied and now makes explicit the view that the Ad Hoc Committee guidelines are a good working framework within which that kind of structure can and should be developed.

The plaintiffs have asked for a general injunctive order with certain provisions restricting some of the policies of the District. They also seek certain immediate remedial orders.

During the period established for the briefing schedule at the conclusion of the evidentiary hearing on the subject motion, this court was informed by counsel that they were engaged in serious negotiations for settlement of this case. The briefing schedule was altered to accommodate that effort. It now appears appropriate, having determined that the District has not yet achieved a completely unitary status for the reasons set forth at length above, and the court having defined what is necessary, including the general outline of a permanent injunction, that the court should provide a new opportunity for the parties to come together to develop an agreed order. It is hoped that negotiations will go forward and agreement will be reached just as the limited English proficiency issues were resolved after the entry of the court's Memorandum Opinion defining the applicable principles of law. In that regard, in accepting the stipulated program for limited English proficient students by the Order entered August 17, 1984, this court reserved for later decision the determination of methods for reporting on the implementation of that program and the question of continuing jurisdiction. That reservation was made to avoid any prejudging of the matter which is now being resolved by this opinion. Accordingly, at this time both phases of this case converge, and the moni-

toring of the language program and continuing jurisdiction with respect to it will also be matters to be discussed in the negotiations which will be undertaken.

Recognizing that a recent election has been held and that there may be some uncertainty about how negotiations may be conducted and to what extent counsel will be authorized to proceed with them, it would be unrealistic to set a specific timetable for that effort. Accordingly, the court will direct that counsel meet with the court to discuss the scope and course of negotiations.

Upon the foregoing, it is

█ ORDERED, that the defendants' motion to declare School District No. 1 unitary, to terminate jurisdiction, and to vacate or modify the 1974 Final Decree and Injunction is denied, and it is

FURTHER ORDERED, that counsel for all parties shall meet with the court in the court's conference room for a discussion of the possibilities of negotiation and settlement on June 28, 1985 at 1:00 p.m.